**In re Randall J. HAKE and Mary Ann Hake, Debtors.**

**Buckeye Retirement Co., L.L.C., Ltd., and Mark A. Gleason, Chapter 7 Trustee, Plaintiffs,**

v.

**Randall J. Hake, and Mary Ann Hake, Defendants.**

**Bankruptcy No. 04–41352.**
**Adversary No. 06–04153.**

United States Bankruptcy Court, N.D. Ohio.

March 21, 2008.

Mark A. Beatrice, Youngstown, OH, for Debtors/Defendants.

F. Dean Armstrong, Flossmoor, IL, James McNally, John R. O'Keefe, Matthew C. Collins, Metz Lewis LLC, John M. Steiner, Leech Tishman Fuscaldo & Lampl, LLC, Pittsburgh, PA, Victor O. Buente, Jr., Newton Falls, OH, for Plaintiffs.

Thomas J. Lipka, Manchester, Bennett, Powers & Ullman, for Defendants.

## MEMORANDUM OPINION REGARDING CONSOLIDATED TRIAL ON COMPLAINTS SEEKING DENIAL OF DISCHARGE

KAY WOODS, Bankruptcy Judge.

The Court conducted a five-day trial in these consolidated adversary proceedings, during which it received testimony of seven witnesses and admitted 87 exhibits into evidence.

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and General Order 84

issued by the United States District Court for the Northern District of Ohio on July 16, 1984, which referred "all cases and proceedings" pursuant to 11 U.S.C. § 157(a) to the Bankruptcy Judges of this district. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A), (J), and (O).

Based upon the testimony and exhibits received at trial, the arguments of counsel, the post-trial briefs, and the entire record of this case, the Court makes the following findings of fact and conclusions of law, pursuant to FED. R. BANKR.P. 7052.

## I. FACTS

This case has had a tortured history. Debtors Randall J. Hake ("Debtor") and Mary Ann Hake (collectively, "Debtors") initially filed a chapter 11 case on March 25, 2004 [1] because their debts exceeded the limit to qualify for a chapter 13 filing. Buckeye Retirement Company, Inc. LLC., Ltd. ("Buckeye") is the largest creditor in this case, holding an unsecured claim in the amount of $1,894,501.97.

Prior to commencement of this bankruptcy case, Buckeye aggressively pursued Debtors to collect its debt, including initi- ating a foreclosure action [2] against Debtors' residence. The residential foreclosure action was settled in February 2002 with Buckeye receiving payment of approximately $102,000.00 (Def.Ex.18), which represented the agreed amount of Debtors' equity in the property. Buckeye also foreclosed and took possession of other real property upon which Debtor operated business activities.[3] As a result of conduct by Buckeye relating to the non-residential foreclosure action, Debtor filed criminal charges against Buckeye and certain Buckeye representatives, which charges were not pursued by law enforcement officials.

Buckeye tried to portray the hostility between the parties as one-sided—emanating from Debtors only, but it would be clear to any observer that the hostility and animosity between Buckeye and Debtors runs both ways.[4] In his opening statement, counsel for Buckeye stated that "this case is not about the relationship of the parties which has been demonstrated to be, and at various times, described with words such as tumultuous, volatile or emotional. This case is about the facts and the law." (Trial Tr. at 15.) However, in direct contravention of that opening state-

---

1. Because this case was filed prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), the Bankruptcy Code prior to amendment governs this case.

2. *Buckeye Retirement Co., LLC Ltd. v. Randall J. Hake, et al.,* Trumbull County (Ohio) Court of Common Pleas, Case No.2000–CV–01700.

3. This foreclosure action resulted in Buckeye retaining a trailer located on such property. The trailer, which had been used by Debtor as an office for one of his businesses, may have contained certain records of Debtors.

4. See Trial Tr. at 671–72 wherein Buckeye representative Peter Barta testified that he contemplated filing several lawsuits against Debtors in their personal capacity and that

Daniel Cadle, principal owner of Buckeye, had once stated that he intended to "get" an attorney with whom Debtors previously dealt. In his opening statement, counsel for Trustee stated that "it's easy to perceive Buckeye as a bully in this case. They've been very aggressive in collecting the debt owed to them. They've been very litigious in this case, some of which the Trustee has opposed and simply just not agreed with Buckeye and not joined in." On the other hand, counsel for Trustee also stated that Trustee had made his own investigation of Debtors and believed Debtor "has not been honest within the context of this case .... [has] given evasive answers .... he just seems to have a general demeanor of defiance." (Trial Tr. at 18.)

ment, the first exchange between Buckeye's counsel[5] and Debtor concerned counsel's suggestion that Debtor blamed Buckeye for forcing him into bankruptcy. Buckeye's counsel then challenged Debtor to admit that Debtors have "strong and bitter feelings against Buckeye." (Trial Tr. at 29.)

The Court provides this overview only in an effort to help explain the tenor of this case and the ill feelings on both sides.

## II. MAIN CASE (Case No. 04–41352 )

### A. The Chapter 11 Case

On March 25, 2004 ("Petition Date"), Debtors filed a voluntary petition pursuant to chapter 11 of title 11 of the United States Code. Buckeye's Claim No. 13 in the amount of $1,894,501.97 is based on certain commercial guaranties executed by Debtors, which Buckeye purchased from Second National Bank of Warren.[6]

Although the United States Trustee ("UST") did not appoint a committee in this case, Buckeye has been an active participant throughout the duration of this case—both while it was a chapter 11 case and after conversion to chapter 7.[7]

Understanding that valuation of Debtors' assets was a point of contention in this case, Debtors filed Application for Order Authorizing Employment of Appraiser of Household Goods With Affidavit Attached on January 18, 2005. The Court granted the Application on February 15, 2005. In connection with such retention, Ronald Roman of George Roman Auctioneers, Ltd. and Roman Realty, Ltd. prepared an appraisal of Debtors' personal property, furniture and furnishings, as well as four pieces of jewelry ("Roman Appraisal"). Debtors attached and incorporated the Roman Appraisal as Exhibit 3 to their Amended Disclosure Statement. (Pl. Ex.39.) The Roman Appraisal appraised the liquidation value of Debtors' personal property, furniture, and furnishing at $9,130.00. Four pieces of jewelry were separately appraised with a liquidation value of $7,975.00.

Debtors' Second Amended Disclosure Statement was approved by this Court pursuant to Order dated February 27, 2006.[8] To resolve one of Buckeye's objec-

---

**5.** John O'Keefe gave the opening statement for Buckeye, whereas F. Dean Armstrong was the lead attorney and questioned Debtor. Mr. Armstrong was the lead attorney until his disrespectful and obstreperous conduct caused the Court to order Mr. Armstrong to sit down and permit other counsel to proceed.

**6.** Buckeye filed Claim No. 1 on April 7, 2004, which was amended by Claim No. 10 on May 4, 2006, and subsequently amended by Claim No. 13 on July 10, 2006. Buckeye's Claim Nos. 5, 6, and 7 were disallowed in their entirety pursuant to Court Order dated December 9, 2005. See also Def. Ex. 48.

**7.** By way of some examples, during the chapter 11 case, Buckeye, *inter alia*, (i) objected to the employment of counsel, (ii) filed forty-nine (49) motions for Rule 2004 examinations, (iii) filed a motion to convert this case to chapter 7, (iv) filed a motion to appoint a

trustee, (v) filed various motions for relief from stay to pursue state court lawsuits, (vi) opposed setting a bar date, (vii) opposed extension of the exclusivity period to file a plan of reorganization and a disclosure statement, and (viii) twice (and without leave of Court) filed adversary complaints to pursue alleged fraudulent transfer actions that belonged solely to the bankruptcy estate. In addition, Buckeye objected to every fee application filed in this case, including the fee application filed by Michael Buzulencia, the interim chapter 7 trustee.

**8.** On October 3, 2005, Debtors timely filed a Disclosure Statement and Plan of Reorganization, to which both Buckeye and UST objected. At a hearing on November 16, 2005, Debtors were instructed to amend their Disclosure Statement by December 31, 2005, and a hearing on such amended disclosure statement was set for January 25, 2006. Debtors

tions to the original disclosure statement, Debtors included in the Second Amended Disclosure Statement information concerning Buckeye's offer to purchase all of Debtors' non-exempt assets for $650,000.00 ("Purchase Price"). In connection with Buckeye's offer to purchase, Buckeye and Debtors agreed to the following: (i) Debtors would convert their chapter 11 case to one under chapter 7; (ii) Debtors would sell and Buckeye would purchase all of Debtors' non-exempt assets for the Purchase Price; and (iii) Debtors would redeem certain household goods for $7,130.00 and all jewelry for $16,000.00, which amounts would be deducted from the Purchase Price (collectively, the "Purchase Agreement"). The Purchase Agreement was reduced to writing and signed by Buckeye and Debtors.[9]

## B. The Chapter 7 Case

As set forth above, in reliance on their agreement with Buckeye, Debtors converted their case to chapter 7 on April 26, 2006. Michael Buzulencia was appointed interim chapter 7 trustee. At the first meeting of creditors on June 20, 2006, Buckeye moved for the election of Mark A. Gleason as chapter 7 trustee. As a consequence, the meeting was adjourned and reconvened by the UST. On August 28, 2006, Buckeye's election of Mark A. Gleason as trustee ("Trustee") was confirmed by order of this Court.

Buckeye filed the instant adversary proceeding (Adv.Pro. No. 06–04153) on August 21, 2006, and, on October 19, 2006, Trustee also filed an adversary proceeding objecting to discharge (Adv.Pro. No. 06–04172).[10]

## C. The Schedules

On the Petition Date, Debtors filed their original schedules and statement of financial affairs. On February 15, 2005, Debtors filed: (i) amended summary of schedules; (ii) amended schedules B, C, and F; (iii) amended declaration concerning debtors' schedules; (iv) amended statement of financial affairs; and (v) amended declaration concerning debtors' amended schedules.

On May 24, 2006, Debtors filed: (i) second amended summary of schedules; (ii) second amended schedules B, C, F, I, J; and (iii) amended declaration concerning debtors' schedules. Although the schedules were not amended to reflect the Roman Appraisal, this Appraisal had been

timely filed their First Amended Joint Disclosure Statement and Amended Joint Plan of Reorganization. Buckeye objected to this amended disclosure statement. This Court held a two-day hearing on Debtors' amended disclosure statement on January 25, 2006, and February 9, 2006, at the conclusion of which Debtors were to further amend the disclosure statement. As a consequence, Debtors filed Second Amended Disclosure Statement on February 22, 2006.

9. Because this case was converted to one under chapter 7, the Purchase Agreement was not approved by the Court or consummated; instead, it was preserved for the chapter 7 trustee to evaluate. Subsequently, Buckeye informed Trustee that it would not follow through with the Purchase Agreement. On March 26, 2007, Trustee filed Motion to Enforce the Sale of Substantially All Debtors' Non–Exempt Assets to Buckeye Retirement Company, LLC, Ltd. or, in the Alternative, for the Award of Attorney's Fees Under 11 U.S.C. § 105 ("Motion to Enforce"). After a hearing, the Court granted the Motion to Enforce on May 18, 2007. Buckeye appealed the order granting the Motion to Enforce. The parties resolved their differences, and the Court approved a compromise that resolved the appeal. Subsequently, Trustee filed a motion to sell the assets, which was granted (with certain exceptions) at a hearing on February 5, 2008.

10. The Court had extended Trustee's time to file an adversary proceeding objecting to discharge.

filed previously with the Court in connection with the Second Amended Disclosure Statement, and the values therein were adopted by Buckeye and Debtors for purposes of the Purchase Agreement.

### III. ADVERSARY PROCEEDING

#### A. Case No. 06–04153

On August 21, 2006, Buckeye initiated this adversary proceeding, which objects to Debtors' discharge pursuant to 11 U.S.C. § 727. Debtors filed their Answer on October 2, 2006. Pursuant to this Court's Case Management Order, the parties filed Proposed Discovery Plan on October 25, 2006, which proposed that all discovery would be completed by June 21, 2007.

On October 20, 2006, Buckeye moved to withdraw the reference, which was denied by United States District Court Judge Peter C. Economus on April 27, 2007.

#### B. The Counterclaim

On February 5, 2007, Debtors moved for leave to file a counterclaim ("Counterclaim") seeking declaratory judgment. Trustee supported the motion because the issues presented in the Counterclaim would need to be resolved to bring the bankruptcy case to conclusion. The Court granted Debtors leave to file the Counterclaim, which was filed on February 8, 2007. Debtors also added Trustee as a necessary party to the lawsuit.

The Counterclaim seeks a declaration from the Court that (i) certain items do not constitute property of the bankruptcy estate and, (ii) as a consequence, Debtors, the bankruptcy estate, and Trustee did not have, as of the Petition Date, and currently do not have any rights, claims, or interests—including equitable interests—in such items. The Counterclaim further seeks a declaration that the Hake Family Irrevocable Trust ("Hake Trust") is a valid spendthrift trust. Buckeye, Trustee, and Debtors stipulated during trial that all items (except a $147,000.00 payment to Chris Hake, hereinafter referred to as "$147,000.00 Payment") listed in the Counterclaim were not and had never been property of the bankruptcy estate. As a consequence, the Counterclaim, except as herein noted, was not adjudicated at trial.

As a result of the Stipulations, which was "so ordered" by the Court on November 1, 2007, Buckeye and Trustee agreed that neither of them allege or claim that Debtors failed to disclose the following: (a) Business interest with William Kerfoot; (b) Interest in Mauro Circle Limited Partnership; (c) $6,000 loan owed by Edward Hrosar; (d) $12,000 loan due from Bruce Berry; (e) [deliberately left blank]; (f) Partnership or other interest in Eastgate Technology Park, Ltd.; (g) Partnership or other interest in Newco Development Corporation; (h) Partnership or other interest in Northeast Printing Services, Inc.; (i) Partnership or other interest in Founders Square, L.L.C.; and (j) Partnership or other interest in HHH Construction Services, Inc. (Stipulations ¶ 1.) In addition, neither Buckeye nor Trustee allege or claim that Debtors had or have actual ownership or equitable ownership in the following or that the following are property of the bankruptcy estate: (a) Woodland Park Retirement Housing Limited Partnership; (b) Applecrest Village Limited Partnership; (c) the Hake Trust; (d) The Christopher R. Hake Irrevocable Trust; (e) HHH Construction Services, Inc.; (f) Founders Square, LLC; (g) Eastgate Technology Park, Ltd.; (h) Newco Development Corporation; (i) Northeast Printing Services, Inc.; (j) Mauro Circle Limited Partnership; (k) Churchill Commons Corporation; and (*l*) Cynthia Corporation. (Stipulations ¶ 2.) Buckeye and Trustee

stipulated that all interests set forth in paragraphs 1 and 2 of the Stipulations are not property of the bankruptcy estate (Stipulations ¶¶ 3 and 5) and Trustee did not have a transferable interest in such items (Stipulations ¶ 4). Furthermore, Buckeye and Trustee stipulated that they did not claim or allege that the Hake Trust is an invalid spendthrift trust or that any of the rights therein are subject to being transferred by Trustee. (Stipulations ¶ 9.)

### C. Consolidation With Case No. 06–4172

On May 30, 2007, Trustee moved to consolidate *Mark Gleason, Chapter 7 Trustee v. Randall Joseph Hake, et al.* (Case No. 06–4172) with the instant adversary proceeding on the basis that both adversary proceedings object to Debtors' discharge on similar grounds. There being no opposition to the motion to consolidate, after a hearing, the Court consolidated Case No. 06–4172 with the instant adversary proceeding on June 12, 2007.

### D. Discovery

In addition to all of the Rule 2004 Exams Buckeye sought in the main case, Buckeye issued at least 143 subpoenas to unrelated third parties. In addition, Buckeye and Trustee deposed Mr. Hake and took the deposition of Mrs. Hake upon written questions.[11]

On September 20, 2007, Buckeye moved to conduct an oral deposition of Mrs. Hake, which was opposed by Debtors. The Court held a hearing on October 3, 2007, and ordered Mrs. Hake to appear for deposition. Mrs. Hake did not appear for

the scheduled deposition, which resulted in the Court issuing an order on October 26, 2007, that denied her discharge as a sanction for failure to comply with the Court's October 3, 2007, order. On October 25, 2007, Buckeye and Trustee moved to continue the trial until Mrs. Hake submitted to a deposition. The Court held a hearing and denied such motion on October 26, 2007.

Subsequent to the Final Pretrial Hearing on August 9, 2007, the Court issued its Trial Order on August 10, 2007. (AP Doc. # 120.) As set forth above, trial began on October 29, 2007, and continued for five days. Because the Court had already denied a discharge to Mrs. Hake, trial proceeded against Mr. Hake only and was limited to his conduct.

### E. Pre-trial Motions and Rulings

Prior to trial, the parties filed several motions in limine. Debtors filed two such motions: (i) seeking to prohibit Plaintiffs from pursuing the valuation and characterization of Debtors' household goods and personal property appraised by the Roman Appraisal; and (ii) seeking to prohibit Plaintiffs from calling Mrs. Hake as a witness at trial. Plaintiffs filed a motion seeking to exclude testimony of Debtors' two identified expert witnesses.

The Court ruled on all three motions prior to trial, as follows: (i) Debtors' motion regarding valuation and characterization of personal property was denied; (ii) Debtors' motion to exclude Mrs. Hake as a witness was granted; and (iii) Plaintiffs'

---

11. Buckeye deposed and/or examined Mrs. Hake on several occasions, including prior to the hearing on the Amended Disclosure Statement. In connection with this adversary proceeding, Buckeye noticed the deposition of Mrs. Hake for June 1, 2007. On May 18, 2007, Debtors moved to quash the depositions of both Debtors. The Court permitted the

deposition of Mr. Hake to go forward at a mutually agreeable time and place, limited to seven hours for questions by both Buckeye and Trustee. In addition, based upon the agreement of the parties, the deposition of Mrs. Hake was to be conducted by written (instead of oral) questions.

motion to exclude expert witness testimony was denied. Plaintiffs lodged a continuing objection to the Court's (i) exclusion of Mrs. Hake as a witness, and (ii) refusal to exclude Debtors' experts. The issue regarding Debtors' experts is partially moot since Debtor did not call John Stolar to testify in light of the parties' Stipulations concerning the Counterclaim. Although the Court allowed the testimony of Andrew W. Suhar, the Court did not base the present decision on any testimony or opinion provided by Mr. Suhar. The ultimate question for the Court to decide regarding the denial of Debtor's discharge remained with the Court, and the Court exercised its authority without relying on the testimony of any expert.

Not only did Plaintiffs enter a continuing objection to the exclusion of Mrs. Hake as a witness, Buckeye flagrantly violated the Court's order and attempted to subpoena Mrs. Hake to testify at trial. Buckeye defied this Court's Order and attempted to obtain the assistance of the U.S. Marshals [12] to serve a subpoena on Mrs. Hake for her attendance at trial despite acknowledging the Court's order—issued three days earlier—that she could not be called as a witness. Mr. Armstrong, who stated that he, alone among Buckeye's attorneys, was responsible for issuance of the subpoena, argued, "I do not believe it to be a violation of the Court order to have a subpoena issued on Mrs. Hake." (Trial Tr. at 111.) Mr. Armstrong insisted that, because he disagreed with the Court's order, Buckeye's attempts to serve Mrs. Hake with a subpoena were appropriate. (Trial Tr. at 109–113.) Moreover, when the attempt to serve the subpoena was thwarted, Mr. Armstrong cavalierly stated, "I do not believe that those efforts [to

serve Mrs. Hake with a subpoena] were in violation of the Court order. They have stopped so I suppose we can respectfully agree to disagree on that subject...." (Trial Tr. at 113.)

The Court's order granting the motion in limine held that: (i) because Mrs. Hake had already been denied a discharge, there was no reason for Plaintiffs to attempt to establish that her conduct violated 11 U.S.C. § 727; (ii) Plaintiffs acknowledged that they intended to call Mrs. Hake for the purpose of contesting Mr. Hake's discharge and, to the extent such questioning would implicate confidential communications between Mr. and Mrs. Hake, such testimony is encompassed within the confidential communications privilege; and (iii) the affidavit submitted by Mrs. Hake was not sufficient for the Court to determine that Mrs. Hake would suffer psychological harm if she were required to testify. The Court's order provided that Plaintiffs could seek reconsideration of the order under two circumstances: (i) Mrs. Hake's testimony was essential to their case objecting to the denial of Mr. Hake's discharge; and (ii) testimony by Mrs. Hake would not implicate confidential communications between husband and wife. Although Buckeye did ask for reconsideration of the Court's ruling at the close of its case, it did not do so based on either of these reasons. Indeed, Buckeye conceded that (i) Mrs. Hake's testimony was not essential to its case against Mr. Hake, and (ii) its questions would implicate confidential communications between Mr. and Mrs. Hake. (Trial Tr. at 870–71.)

At the conclusion of Plaintiffs' case, Buckeye proffered that, had it been permitted to call Mrs. Hake as a witness, her testimony would have covered the follow-

---

12. Buckeye failed to utilize the correct procedure and directly contacted the U.S. Marshals at the United States District Court, which resulted in a great deal of confusion. (See Trial Tr. at 110–12.)

ing topics: [13] (i) valuable gold and diamond jewelry owned as of the Petition Date; (ii) Mr. Hake's knowledge that Debtors had undisclosed checking accounts in their joint names and/or over which Mrs. Hake had authority with a third party or in her own name, which were used for personal expenses; (iii) Mr. Hake's knowledge of and possible direction to not disclose certain jewelry; (iv) transfer of assets due to Mrs. Hake from the Wishka probate estate; (v) transfer of a Mercedes Benz to Mrs. Hake's sister, Irene Loveland; (vi) Mr. Hake's knowledge of "many thousands of charges to Chris Hake's American Express card" for personal and household matters; (vii) Mrs. Hake's knowledge regarding the $160,000.00 mortgage to Chris Hake and credits thereto to reduce the balance; (viii) "additional testimony" concerning transfer of the house in which Debtors reside to the Hake Trust and the adjoining vacant lot to the Christopher R. Hake Irrevocable Trust; (ix) Debtors' intention that the bankruptcy filing be joint and consolidated; (x) "cumulative testimony" acknowledging the two Key Bank accounts; and (xi) pre-petition use of the Randall J. Hake, P.E., LLC checking account to pay personal and household expenses. (Trial Tr. at 859–64.) With the exception of testimony about the jewelry, counsel for Buckeye essentially acknowledged that most of the proffered testimony concerning Mr. Hake was cumulative and/or available from other sources. (Trial Tr. at 864–67.) To the extent Buckeye's proffer dealt with Mrs. Hake's testimony about her own conduct or knowledge (e.g., her jewelry, her inheritance from the Wishka probate estate, her check writing authority, and/or transfer of the Mercedes

to her sister), such testimony was unnecessary and irrelevant since the Court had previously denied Mrs. Hake a discharge.

### F. Closing and Post–Trial Briefs

Counsel for all parties were permitted to make short closing arguments, based on the understanding that they wished to file post-trial briefs. The Court gave the parties two weeks after receipt of the written trial transcript to file post-trial briefs.

### G. Conduct of Buckeye's Counsel, Mr. Armstrong, at Trial

It is unfortunate, but the conduct of Mr. Armstrong, Buckeye's lead trial counsel, can best be described as unprofessional and disrespectful to the Court. On numerous occasions (e.g., Trial Tr. at 85–87, 109–14, 149–52, 325–26, 697–98, 732–33) Mr. Armstrong was argumentative, disrespectful, and antagonistic toward the Court, including rolling his eyes and making faces while the Court was speaking and raising his voice. The Court warned Mr. Armstrong repeatedly, but his conduct continued until the Court ultimately had to order him to sit down and have other counsel proceed with trial. (Trial Tr. at 733.) Even after being told that he could participate as a spectator only, Mr. Armstrong was disruptive. The Court had to direct Mr. Armstrong to sit down again when he stood at the lectern whispering while other counsel representing Buckeye attempted to speak. (Trial Tr. at 867.)

### IV. Plaintiffs' Causes of Action

Buckeye and Trustee filed separate complaints that do not contain identical factual allegations, but both seek the denial of

---

**13.** Despite all of the previous opportunities to depose Mrs. Hake, Buckeye had failed to ask her any of the questions about which they purportedly needed her testimony at trial. The inability to depose Mrs. Hake immediately prior to trial and/or call Mrs. Hake as a witness at trial does not appear to have adversely affected the ability of either Plaintiff to present its case.

Debtors'[14] general discharge pursuant to 11 U.S.C. § 727. The two Complaints urge the Court to deny discharge on the basis that: (i) with intent to hinder, delay or defraud a creditor, Debtor transferred, removed, destroyed, mutilated or concealed or permitted to be transferred, removed, destroyed, mutilated or concealed, property within one year prior to the Petition Date pursuant to § 727(a)(2) (Buckeye's Count One and Trustee's Count One); (ii) Debtor concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information, which may have included books, documents, records and papers from which Debtors' financial condition or business transactions might be ascertained, pursuant to § 7272(a)(3) (Buckeye's Count Two and Trustee's Count Two);[15] (iii) Debtor knowingly and fraudulently made a false oath or account and presented or used a false claim, pursuant to § 727(a)(4) (Buckeye's Count Three and Trustee's Count Three); (iv) Debtor failed to satisfactorily explain the loss of assets and/or deficiency of assets to meet Debtor's liabilities, pursuant to § 727(a)(5) (Buckeye's Count Four);[16] and (v) it is inequitable for Debtors to receive a discharge (Buckeye's Count Five).

In its post-trial brief, Buckeye asserts that there are 18 instances of Debtor's conduct that are sufficient to preclude his discharge.[17] (Buckeye's Brief at 3–4.) Trustee "incorporates by reference … the 17[sic] items identified by Buckeye" in its brief. (Trustee's Brief at 8, n. 4.) Despite the myriad of instances that Plaintiffs allege support denial of discharge, both Buckeye and Trustee rely most heavily on Debtor's alleged concealed beneficial interest in the residence. (Buckeye's Brief at 5–10; Trustee's Brief at 4–8.)

## V. LEGAL STANDARD FOR REVIEW

The discharge provision of § 727 has been described as "the heart of the fresh start provisions of the bankruptcy law." H.R.Rep. No. 595, 95th Cong., 1st. Sess. 384 (1977). Discharge "embodies the principle that the bankruptcy laws afford to the honest debtor a fresh start in life free from the onus of oppressive debt." *Rafoth v. Chimento, (In re Chimento )* 43 B.R. 401, 403 (Bankr.N.D.Ohio 1984). Because discharge is the objective of a bankruptcy case, denial of discharge is a drastic measure. "Completely denying a debtor his discharge, as opposed to avoiding a transfer or declining to discharge an individual debt pursuant to § 523, is an extreme step and should not be taken lightly." *Rosen v. Bezner,* 996 F.2d 1527, 1531 (3rd Cir.1993). The Third Circuit Court of Appeals went on to state in *Rosen* that, "[A] total bar to discharge is an extreme penalty. From the statutory language, it is clear that Congress intended this penalty to apply only where there is proof that the debtor intentionally did something im-

---

**14.** As set forth above, the Court denied Mrs. Hake a discharge prior to the start of trial. Although the complaints are directed against both Debtors, trial dealt with Mr. Hake only.

**15.** Buckeye alleges that the facts underlying this count include, but are not limited to, Mr. Hake's statement at the chapter 11 first meeting of creditors that he had no records of a $235,000 loan to John J. Cafaro. At the conclusion of the trial, Trustee stipulated to the dismissal of Count Two of his Complaint. (Tr. at 1040.)

**16.** Buckeye alleges that the facts underlying this count include, but are not limited to, Mr. Hake's statement at the chapter 11 first meeting of creditors that he could not explain how his income was less than the amount he had paid to his son, Chris Hake.

**17.** The Court does not find it necessary to deal with each of the 18 instances cited by Buckeye and, for the sake of brevity, will not do so.

proper during the year before bankruptcy[.]" *Id.* at 1534.

■ "The provisions denying a discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor." 6 COLLIERS ON BANKRUPTCY ¶ 727–12.1[4] (Alan N. Resnick & Henry J. Sommer eds., 15 ed. rev.2006). Hence, § 727 is to be construed liberally in favor of the debtor and strictly against the objector. *In re Chimento*, 43 B.R. at 403 (citing *Kasakoff v. Schnoll (In re Schnoll)*, 31 B.R. 909 (Bankr.E.D.Wis.1983); *Patterson Dental Co. v. Mendoza (In re Mendoza)*, 16 B.R. 990 (Bankr.S.D.Cal.1982); *Baltic Linen Co., Inc. v. Rubin (In re Rubin)*, 12 B.R. 436 (Bankr.S.D.N.Y.1981); *O'Brien v. Terkel (In re Terkel)*, 7 B.R. 801 (Bankr.S.D.Fla.1980)). However, "[w]hile the law favors discharges in bankruptcy, it will not ordinarily tolerate the [debtor's] intentional departure from honest business practices where there is reasonable likelihood of prejudice." *Kentile Floors, Inc. v. Winham*, 440 F.2d 1128, 1131 (9th Cir.1971).

■ FED. R. BANKR.P. 4005 imposes the burden of proof on the party objecting to discharge. Because § 727 must be construed liberally in favor of the debtor, "[t]his burden is not easily met." *In re Chimento*, 43 B.R. at 403. The standard of proof in a case seeking discharge under § 727 is the preponderance of the evidence standard. *See Grogan v. Garner*, 498 U.S. 279, 289, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (dictum). The Sixth Circuit Court of Appeals has held that "[t] he elements of a violation of 11 U.S.C. § 727 must be proven by a preponderance of the evidence to merit denial of discharge." *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir.2000). "Since the *Grogan* decision, courts in at least eight districts have reversed their prior holdings and have held that a preponderance of the evidence

is sufficient [for a denial of discharge]." *Ransier v. McFarland (In re McFarland)*, 170 B.R. 613, 628 (Bankr.S.D.Ohio 1994) (citations omitted).

*A. Section 727(a)(2)(A )*

■ Counts I in Buckeye's and Trustee's Complaints allege that Debtor's discharge should be denied based on 11 U.S.C. § 727(a)(2), which provides:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the fling of the petition;

11 U.S.C. § 7272(a)(2)(A) (Thomson/West 2007).

In their post-trial briefs, both Buckeye and Trustee assert that the most compelling reason to deny Debtor a discharge is the "continuing concealment of his beneficial interest in his residence" pursuant to § 727(a)(2). (Buckeye Brief at 5.) Both Plaintiffs cite *Keeney v. Smith (In re Keeney)*, 227 F.3d 679 (6th Cir.2000) as a closely analogous case that compels this Court to deny Debtor a discharge on the basis that he retained, but failed to disclose, an equitable interest in the house where Debtors reside, despite its ownership by the Hake Trust.

In *Keeney*, the debtor purchased, over a couple of years, two tracts of real estate and placed title to both properties in the names of his parents. Keeney and his wife lived on the first property for about a year after it was purchased in 1982. During that time, they paid no rent to debtor's parents; however, either debtor or his

company made all mortgage payments. In 1985, debtor executed a new note secured by the first property (held in the names of his parents), as well as the inventory, fixtures, and equipment of debtor's company. Keeney or his company made the down payment and paid the balance of the purchase price when the second property was purchased in 1983. Keeney and his wife moved into the second property, upon which debtor or his company paid for improvements and made all mortgage payments. When Keeney filed for protection pursuant to chapter 7 of the Bankruptcy Code in 1996, a creditor, who held a judgment from 1971, objected to discharge. The Sixth Circuit found that:

> [a] beneficial interest of ownership in the property can be inferred, however, from Keeney's payment for and use of the properties, including his rent-free residence on each and payment of all mortgage obligations. As noted by the district court, no explanation was provided as to why the properties were titled in the parents' names. Courts have found that a debtor retained a beneficial interest in property under similar circumstances.

*Id.* at 683–84.

The *Keeney* court cited *Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550 (5th Cir.1987) and *Friedell v. Kauffman (In re Kauffman)*, 675 F.2d 127 (7th Cir.1981) in support of the proposition that a beneficial interest can be found when a debtor lives in a house, makes mortgage payments, and uses the house as collateral for loans, or occupies a house with acts of ownership such as insuring and maintaining the property. *In re Keeney*, 227 F.3d at 684.

Despite the facial similarities to the *Keeney* case, this Court finds that the distinctions between *Keeney* and the instant case are more persuasive and require a different result. First and foremost, unlike the transfers in *Keeney, Olivier*, and *Kauffman*, the transfer from Debtors to the Hake Trust has none of the badges of a fraudulent transfer. Neither Plaintiff can assail the transfer of the residence to the Hake Trust as a fraudulent transfer because adequate equivalent consideration was given at the time of transfer. The residence was transferred in connection with settlement of a foreclosure action brought by Buckeye against the property in or about 2002. Buckeye held a judgment lien against the residence. At that time, the first mortgage on the house exceeded the sheriff's appraisal of the residence. If Buckeye had gone forward with the foreclosure sale, it is likely that the holder of the first mortgage would have received all proceeds of sale after payment of expenses and real estate taxes. Such an outcome would have benefitted neither Buckeye nor Debtors. As a consequence, the parties reached a settlement whereby Buckeye released its judgment lien on the residence in return for payment of $101,399.81. (See Def. Ex. 20.)

The money to pay Buckeye this settlement amount was procured by two notes executed by the Hake Trust. (Trial Tr. pp. 742, 745–749.) Witness Michael Rosenberg, as trustee for the Hake Trust, stated unequivocally that the Hake Trust took the residence subject to the mortgage and that the Hake Trust is not liable on the mortgage. Mr. Rosenberg testified that the Hake Trust permits Debtors to reside in the house in exchange for "payment of the mortgage plus real estate taxes, insurance premiums, full cost of maintenance and upkeep." (*Id.* at 752.) He stated that the Hake Trust benefits from this arrangement because "[w]hen the [Hake T]rust acquired the property, based upon the sheriff's appraisal, it had a negative net worth so that every payment that is made on the first mortgage creates equi-

ty and someday that it will be a valuable asset[.]" (*Id.*) Had the house been sold at foreclosure, Buckeye would likely have received nothing and Debtors would have had to purchase or rent another place to live.[18]

In the instant case, there is no legal difference between the house being sold at foreclosure to an unrelated third party and transfer to the Hake Trust for value. Transfer to the Hake Trust is the equivalent of and has the same effect as any unrelated third party purchasing the house and renting it to Debtors. Although there is no written lease between the Hake Trust and Debtors, Mr. Rosenberg testified that there is an oral arrangement for Debtors to occupy the house. The effect is the same—the Hake Trust, as owner, benefits by payments Debtors directly make to pay the mortgage, taxes, and other maintenance. (*Id.* at 738–39.) In addition, Mr. Rosenberg stated he did not believe that the Hake Trust could rent the residence to a third party for more than what Debtors pay to occupy the house. (*Id.* at 755.) Mr. Rosenberg's unrefuted testimony is that he, as the trustee of the Hake Trust, is independent and that Debtor has no power to amend or revoke the Hake Trust, withdraw property from the Hake Trust, or remove the trustee. (*Id.* at 743.)

The Hake Trust's payment of adequate and equivalent consideration in support of the transfer is an important distinction between the facts at bar and the cases cited by Plaintiffs. In each of the cases cited by Plaintiffs, a debtor transferred property in a sham transaction that was not supported by consideration. The *Olivier* case is the only case that even suggests that the transferee paid any consideration and, in that case, the court expressly found that the $15,000.00 paid by debtor's mother was returned to her within a few days.[19] Mr. Rosenberg is an independent trustee who controls the assets of the Hake Trust. He testified that Debtor cannot remove or withdraw any property from the Trust, nor can Debtor remove Mr. Rosenberg as trustee. The residence is outside the control of Debtor. The Hake Trust is the legal owner of the residence. Debtor is not a beneficiary of the Hake Trust. (Trial Tr. at 741.) The only rights Debtor has to the residence are the right to occupy it and the right of quiet enjoyment. Although Plaintiffs stressed multiple times that there was no formal lease between the Hake Trust and Debtors, they failed to demonstrate why the oral arrangement between the Hake Trust and Debtors was not sufficient to establish the rights to occupy and quiet enjoyment.[20]

---

**18.** Given the likelihood that any subsequent purchase of real property would have been subject to Buckeye's judicial lien, it is doubtful that Debtors would have purchased a replacement residence.

**19.** In the *Olivier* case, debtor's mother paid $15,000.00 for the house, but debtors returned the consideration within a few days. *In re Olivier*, 819 F.2d at 551. In *Kauffman*, there was evidence that Mr. Kauffman forged his wife's signature on the transfer document and he retained enough ownership interest that he continued to use the house as collateral for several personal loans. *In re Kauffman*,

675 F.2d at 128. In *Keeney*, debtor purchased properties and put such properties in his parents' names without any explanation for doing so. *In re Keeney*, 227 F.3d at 684. All of those cases involved incidents of fraud because there were conveyances of property without adequate consideration. That is not the case here.

**20.** The "lease" for the residence was disclosed by Debtors on Schedule G, filed with their chapter 11 voluntary petition on March 25, 2004.

Plaintiffs allege that Debtor failed to disclose the equitable interest he has in the residence, but they fail to describe what that equitable interest is. Debtor cannot pledge the residence as security. He cannot take out a further mortgage on the property. Any equity created by payment of the mortgage is for the benefit of the Hake Trust, not Debtor. The Hake Trust could terminate Debtor's right to occupy the residence; Debtor would have no recourse in that event. It is not clear to the Court what Plaintiffs would have had Debtor disclose and where disclosure of the alleged equitable interest would have been required.

Plaintiffs have stipulated that "[n]either Buckeye nor Trustee allege or claim . . . that the Debtors *had or have actual ownership or equitable ownership in* the following, or that the following interests are property of the Estate: . . . (c) *The Hake Family Irrevocable Trust* [.]" (Stipulations ¶ 2 (emphasis added).) Buckeye and Trustee further stipulated that the "interests described in ¶¶ 1[sic] and 2 above are not property of the Estate." (*Id.* ¶ 3.) Moreover, "[n]either Buckeye nor the Trustee allege or claim herein that the property of the Estate in this case includes the *equitable interests identified in* ¶ *2[sic] above,* or that the Trustee has any such right, claim or interest to transfer to Buckeye." (*Id.* ¶ 8 (emphasis added).) Last, "[n]either Buckeye nor the Trustee allege or claim herein that the Hake Family Irrevocable Trust is an invalid spendthrift trust and therefore is property of the Estate, or that any of the rights therein are subject to being transferred by the Trustee herein." (*Id.* ¶ 9.)

Since, as Plaintiffs have stipulated, Debtor has no actual or equitable interest in the Hake Trust, what equitable interest can Debtor have in the property held by the Hake Trust, which is a valid, rather than a sham, trust? All that Plaintiffs have argued is that, despite the factual differences between the instant case and the *Keeney* case, Debtor's payment of the mortgage, real estate taxes, and maintenance of the property creates an equitable interest therein. This argument is not supported by the *Keeney* case and is in direct contradiction of the facts and the Stipulations.

Despite the fact that Debtors' schedules are not a model of clarity: (i) the expenses associated with the residence are set forth in Schedule J; (ii) the lease with the Hake Trust for the residence is listed on Schedule G; and (iii) the mortgage holder—Fairbanks Capital Corp.—is listed on Debtors' Statement of Financial Affairs, ¶ 3, as the recipient of payments in excess of $600 in the 90–day period prior to the Petition Date. Trustee cannot avoid the transfer of the residence to the Trust because the Trust gave adequate and equivalent value in exchange for legal title. This Court finds that Debtor's continued occupancy of the residence, coupled with payment of the mortgage, taxes, insurance, and maintenance, is not sufficient to establish that Debtor has a beneficial and/or equitable interest in the house when such house is owned by an irrevocable trust that paid adequate consideration for the house at the time of transfer. Accordingly, this Court finds that there is no equitable interest in the residence that Debtor could have or should have disclosed.

### B. Section 727(a)(3)

Buckeye and Trustee each assert a Count II based on 11 U.S.C. § 7272(a)(3). Trustee, however, stipulated to the dismissal of Count II of his Complaint. "I am prepared to not have the Court waste its time on Count 2 and would submit that the evidence would establish that, as I see it, that the Hakes have been forthcoming

with the information and would stipulate to the dismissal of Count 2." (Trial Tr. at 1040.) Unlike Trustee's Count II, which related to documents that Debtors had not produced at the time the Complaint was filed, Buckeye's Count II provides that Debtor stated at the first meeting of creditors that "he had no records of the $235,000 loan due from John J. Cafaro[.]" (Buckeye's Complaint, ¶ 24.)

Section 727(a)(3) provides, as follows:

(a) The court shall grant the debtor a discharge, unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

11 U.S.C. § 727(a)(3) (Thomson/West 2007).

 The Bankruptcy Court has broad discretion to grant or deny discharge based on § 727(a)(3). *Dolin v. Northern Petrochemical Company (In re Dolin)*, 799 F.2d 251, 253 (6th Cir.1986). Under § 727(a)(3), a debtor's discharge may be denied because he has either actively concealed, damaged, or falsified records or because he has merely failed to keep such records if these records would have allowed creditors to ascertain the debtor's financial condition or relevant business transactions. Furthermore, there is no need to prove fraudulent intent with § 727(a)(3). *Richland Trust Co. v. Haley (In re Haley)*, 2007 WL 3113333, *5, 2007 Bankr.LEXIS 3615, *16 (Bankr.N.D.Ohio Oct. 19, 2007).

 However, in light of the harshness of denial of discharge as a penalty, § 727(a)(3) is "invoked sparingly" and requires more than "the mere ability of a complainant to prove that a specific record was not kept[.]" *Id.* "The adequacy of a debtor's records must be determined on a case by case basis. Considerations to make this determination include debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice." *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 882 (6th Cir. BAP 1999) (quoting *United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 658 (Bankr.N.D.Ohio 1990)).

 At trial, Buckeye failed to carry its burden of proof that Debtor concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information concerning the alleged debt owed by John J. Cafaro. Debtor stated that he had searched his residence and his office for such records, but could not find them. (Trial Tr. at 189.) When Buckeye produced a copy of the memorandum of understanding concerning this debt, Debtor expressed surprise and implied that this document might have been among those left in a trailer at his former worksite when Buckeye foreclosed upon the property.[21] (*Id.*) Debtor implied that he did not have a copy of the document because it had been part of the contents of the trailer left on property upon which Buckeye foreclosed. (*Id.*) If Buckeye came into possession of this document because it was included in the contents of the trailer, Buckeye cannot claim that Debtor's failure to produce such document violated § 727(a)(3). Although there was only an implication (as opposed to evidence) that Buckeye came to possess the document regarding the Cafaro loan by retaining

---

**21.** See page 3, n. 3, *supra.*

records that should have been returned to Debtor, Buckeye offered no explanation concerning how it acquired the memorandum of understanding. In light of this ambiguity, Buckeye failed to carry its burden of proof by the preponderance of the evidence.

Although Debtor conceded that he had previously testified that he might have thrown away the memorandum of understanding regarding the Cafaro loan, he stated that he gave such testimony because he could not locate a copy of the document. (Trial Tr. at 189.) The Court finds this explanation to be credible. The evidence on this subject fails to support, by a preponderance of the evidence, a finding that Debtor concealed, destroyed, mutilated, falsified or failed to keep or preserve any particular records or documents, including, but not limited to any document relating to the alleged $235,000.00 loan to John J. Cafaro.

### C. Section 727(a)(4)

Section 727(a)(4)(A) provides:

(a) The court shall grant the debtor a discharge, unless-

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

11 U.S.C. § 727(a)(4)(A) (Thomson/West 2007).

■■■■ The Sixth Circuit has addressed the elements that must be proven to deny a debtor a discharge under § 727(a)(4)(A):

In order to deny a debtor discharge under this section, a plaintiff must prove by a preponderance of the evidence that: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement

related materially to the bankruptcy case. *See Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992).

*In re Keeney*, 227 F.3d at 685.

■■■■ "Actual fraudulent intent—not the lesser intent of Section 727(a)(2) to delay or hinder a creditor or the trustee— is required." *Bauman v. Post (In re Post)*, 347 B.R. 104, 112 (Bankr.M.D.Fla. 2006). "[I]ntent may be inferred from all of the circumstances surrounding the matter." *In re Parsell*, 172 B.R. 226, 231 (Bankr.N.D.Ohio 1994). But there must be "specific facts or circumstances which point toward fraud." *Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 564 (Bankr. S.D.Cal.1996). The Coombs Court also stated that actual intent to defraud was an "essential element under § 727(a)(4)(A)." *Id.*

■■■■ Buckeye's position concerning false oaths appears, in some instances, to require near perfection on the part of Debtor. Some of the instances that Buckeye asserts support denial of discharge fail to meet the requirements that the statement must be made with fraudulent intent and that it must be material. As an example, Buckeye asserts that Debtor should be denied a discharge because he failed to disclose that he owned a set of golf clubs (Buckeye Complaint ¶ 15), which Debtor testified, without contradiction, were approximately 38 years old. Debtor conceded that he owned the golf clubs and did not disclose them even though he "tried to be as thorough as [he] possibly could." (Trial Tr. at 385.) However, on the basis that the golf clubs were not disclosed, Buckeye asserts that Debtor made a false oath and should be denied a discharge. (Complaint, ¶ 15; Trial Tr. at 385, 967.) There was no testimony that the golf clubs had any value to the estate. Although all household goods were separately ap-

praised by two different appraisers,[22] neither appraiser valued the golf clubs in question, which leads the Court to conclude that they had no material value to the estate. As a consequence, neither intent nor materiality can be found regarding Debtor's failure to disclose the golf clubs.

Likewise, both Buckeye and Trustee spent a great deal of time questioning Debtor about his failure to disclose two checking accounts at Key Bank. (Pl. Exs. 206 and 207). As the exhibits and unequivocal testimony show, each of these accounts had been dormant and not used by Debtors for nearly six years prior to the Petition Date. The amounts in the two accounts were de minimis ($287.94 in Key Bank Account 1 and $24.97 in Key Bank Account 2, respectively, as of the Petition Date.) Debtor testified that he simply had forgotten about the accounts until they were produced by the bank in third party discovery during this case. Although Buckeye challenged Debtor's lack of knowledge about the accounts by insisting that the statements had been mailed to Debtors' residence every month, there was no foundation for such assertion.[23] This Court finds that Plaintiffs failed to establish elements 3, 4, and 5 (that Debtor knew the omission of the bank account information was false, that he failed to disclose the information with fraudulent intent, and that the failure was material) with respect to Key Bank Accounts 1 and 2.

 Despite the fact that some of the instances cited by Buckeye do not meet all of the requirements to state a cause of action for denial of discharge based on false oath, this cannot be said for all of the matters cited by Buckeye. The evidence in this case is troubling regarding the $160,000.00 mortgage on the residence in favor of Chris Hake ("$160,000.00 Mortgage") and the $147,000.00 Payment[24] to Chris Hake. Debtor's testimony on these subjects was inconsistent and confusing.

From Debtor's disjointed testimony, the Court makes the following findings of fact:

1. The $160,000.00 Mortgage is a second mortgage on the residence. (Pl. Ex. 5; Trial Tr. at 321, 760.)

2. In the original schedules, Debtor listed an indebtedness to his son, Chris Hake, in the amount of $12,415.00 ("Original Chris Hake Debt"). (Schedule F dated March 5, 2004; Trial Tr. at 121–22, 952.)

3. Debtor described scheduling the indebtedness to his son at $12,415.00 as "an error in judgment[.]" (Trial Tr. at 153–54.)

4. The $147,000.00 Payment represents the difference (rounded downward) between the face amount of the $160,000.000 Mortgage and the Original Chris Hake Debt.

5. The reduction on the debt secured by the $160,000.00 Mortgage by the $147,000.00 Payment "was not in the form of payments." (Trial Tr. at 125–26.)

6. The reduction was based on recognition by Debtor that $97,000.00 ("Mr. Hake's $97,000.00") of the $160,000.00 Mortgage was money

---

**22.** Debtors had their personal property appraised by the Roman Appraisal. Subsequently, Trustee engaged Royal York Auction Gallery, Ltd. to conduct a separate appraisal.

**23.** Mr. Barta testified that, based on his own experience, if a bank account had an address on it, it would be mailed to that address each month. This generalized testimony about Mr. Barta's experience cannot defeat Mr. Hake's unrebutted testimony that he had not seen the statements for years prior to the Petition Date.

**24.** See page 9, *supra*.

that he received from Elm Road Development Company as repayment of a loan to Applecrest Village Apartments. (Trial Tr. at 125, 688–90.) It was a "mathematical calculation that was done because the [$]97,000 was actually funds that were paid to [Debtor] from the Applecrest loans.... the [$]160[,000] was reduced by the $97,000.00 it should have been." (Trial Tr. at 129.) The $160,000.00 Mortgage included Mr. Hake's $97,000.00. (Trial Tr. at 984.)

7. Mr. Hake's $97,000.00 was placed for approximately one month in the custodial account of Chris Hake, but the money was not a gift or a loan to his son. (Trial Tr. at 132, 140.)

8. The $160,000.00 Mortgage and note relating thereto were put in place in 1999, but Debtor did not make any adjustment for Mr. Hake's $97,000.00 until Debtor completed his bankruptcy schedules in 2004. (Trial Tr. at 131–135.)

9. Debtor testified at the chapter 11 § 341 meeting with the UST Bankruptcy Analyst (Mr. Sonson) that Debtors owed their son, Chris Hake, approximately $12,000.00. (Trial Tr. at 127–34, 141–42.)

10. The difference between the $147,000.00 Payment and Mr. Hake's $97,000.00 is $50,000.00, which relates to Newco Development ("Newco $50,000.00"). (Trial Tr. at 953.)

11. When Debtors amended their schedules, they changed the amount of their indebtedness to Chris Hake from $12,415.00 to $62,415.00 to account for the Newco $50,000.00. Debtor states he originally "characterized that [Newco $50,000.00] as a loan instead of a

gift" to his son. (Trial Tr. at 953–54.)

12. Despite acknowledging that the $160,000.00 Mortgage debt should be reduced by Mr. Hake's $97,000.00, Debtor told Trustee that the current balance on the $160,000.00 Mortgage debt to Chris Hake was still $160,000.00. (Trial Tr. at 157.)

As set forth above, Debtor's testimony concerning the $147,000.00 Payment and Mr. Hake's $97,000.00 is confusing, at best. The Court tried, in vain, to find a coherent story relating to the $160,000.000 Mortgage and the $147,000.00 Payment, but the testimony demonstrates that Debtor was less than forthcoming about these matters. For example, Debtor acknowledged that $97,000.00 of the money loaned and backed by the $160, 000. 00 Mortgage belonged to Debtor rather than Chris Hake. Despite this acknowledgment, Debtor failed to state unequivocally whether he ever intended the $97,000.00 to be a gift to his son.

Q. And the Applecrest money that was yours, which is part of this a hundred sixty thousand dollar mortgage was never intended by you to be a gift to your son, correct?

A. That's not necessarily true, but the hundred and sixty thousand was in the account. And when I needed the hundred and sixty thousand to satisfy Bank One, I had to take it out of the account and my wife was very upset with me and the mortgage was put on for 160.

Q. Was the $97,000.00 supposed to be a gift to Chris Hake?

A. It—it may have been a gift to Chris Hake, but, no.

Q. Was it supposed to be a gift to Chris Hake?

A. At one point in time, I thought it might be a gift to Chris Hake, but no.

Q. I'm sorry. At the time—

A. At one point—I'll say it again. At one point in time, I may have—I've wished it would have been a gift to Chris Hake, but no, it wasn't.

Q. Let me—let me approach it this way. Was the 97,000 dollar component of this hundred and sixty thousand dollar mortgage—was the $97,000.00 ever—ever intended by you to be a gift to your son?

A. I wish at the time that I would've have—had the ability to gift my son $97,000.00, but no, the money was my money from Applecrest.

Trial Tr. at 322–23.

The most confusing testimony concerning the $160,000.00 Mortgage concerns the Newco $50,000.00. Debtor testified that he intended the Newco $50,000.00 to be a gift to his son, but he characterized it as a loan. In other words, in order to arrive at the Original Chris Hake Debt of $12,415.00, Debtor "offset[ ][the] Newco [$] 50, 000[. 00] against the amount owed to Christopher[.]" (Trial Tr. at 953.) He further testified that, after talking with his counsel, he amended the schedules to reflect a debt of $62,415.00 to Chris Hake because "[t]hat [Newco] $50,000.00 shouldn't be characterized as—as a loan. It was a gift, so it wasn't owed Christopher at all." (*Id.* at 954.)

From the testimony, the Court understands that Debtor "borrowed" $160,000.00 from his son's custodial account to pay off Bank One in or about early 2002. This is the loan that backs the $160,000.00 Mortgage, which is secured by property now owned by the Hake Trust. Debtor's obli-

gation to repay his son is an unsecured debt, although the debt is otherwise secured by the residence. Of the $160,000.00 loan amount, $97,000.00 (*i.e.,* Mr. Hake's $97,000.00) was never money that belonged to Chris Hake, despite being deposited in the custodial account, but, instead remained the property of Debtor.[25] When Debtor amended the schedules, he "recharacterized" the Newco $50,000.00 as a gift to his son, which would mean that the custodial account owned this amount at the time of the loan, thus increasing the amount of indebtedness to Chris Hake from the Original Chris Hake Debt of $12,415.00 to $62,415.00.

Debtor's testimony about the Newco $50,000.00 is inconsistent and contradictory. Debtor, as either the donor of the gift or the maker of the loan, should definitely know whether the Newco $50,000.00 was a gift or a loan. Despite Debtor's unique knowledge about whether he intended the Newco $50,000.00 to be a gift or a loan, Debtor failed to provide a consistent story about this amount.

Q. So you've testified that it was a loan. You've testified that it was a gift. There were no gift tax returns associated with it, and as we now speak, you claim that that money is—is due to Chris. Is that right?

A. No, I do not. Oh is it due to Chris?

Q. Yes, sir.

A. As part of the 62,000 that I talked about?

Q. Yes, sir.

A. No. No, the—

Q. How do you get the 62,000 figure?

A. The 62,000 is the difference between 160 and 97.

---

25. Chris Hake's deposition testimony corroborates that the entire $160,000.00 borrowed from his custodial account did not belong to him. However, his testimony is that the amount borrowed was "$70,000." (Pl.Ex. 231A at 115.)

Q. So as we speak today, the 50,000, it's still your testimony that it's a gift?

A. Correct.

Q. And you would agreed, would you not, that you've testified in the past that with respect to that 50, while you characterize it as a gift sometimes and a loan sometimes, at the time, it was not intended—there was no donative intent at the very time that the money was given to Chris?

A. It was absolutely at the time the money was given.

(Trial Tr. 1003–04.)

Q. The last time I'll ask. You have testified-

A. Please.

Q. —in the past that you had an ability at any time to recharacterize it as a gift or a loan?

A. I may have.

(*Id.* at 1005–06.)

In the final analysis, this Court finds that Debtor manipulated the amount of the debt he owed his son to fit the situation. The Newco $50,000.00 was either a gift or a loan to his son. Debtor cannot change the character of the Newco $50,000.00 at will to suit the situation.

In addition, Debtor knew that his testimony at the § 341 meeting concerning the $147,000.00 Payment was inaccurate and gave the impression that the $160,000.00 Mortgage had been paid down by $147,000.00. Debtor knew that no payments had ever been made to reduce the $160,000.00 Mortgage note. Because Debtor provided this information and testimony despite knowing it was false, circumstances indicate that he made these statement with fraudulent intent. These statements were material regarding Debtor's true liabilities and his true financial condition. As a consequence, Debtor's conduct concerning the $147,000.00 Payment and the Newco $50,000.00 meets all of the criteria for false oath, as set forth in *Keeney,* because: (i) Debtor made statements about the indebtedness to his son under oath (both in the schedules and in testimony); (ii) the statements about the indebtedness to Debtor's son were false; (iii) Debtor knew the statements were false; (iv) Debtor made the statements with fraudulent intent (inferred from the inconsistent and contradictory testimony); and (v) these statements related materially to Debtor's bankruptcy case. Thus, Buckeye and Trustee have proven the elements of false oath, sufficient to deny Debtor a discharge.

As a consequence, this Court finds that Debtor should be denied a discharge for the reasons set forth herein.

### D. Section 727(a)(5)

Buckeye also alleges that Debtor should be denied a discharge on the basis of § 727(a)(5), which states:

(a) The court shall grant the debtor a discharge, unless—

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C. § 727(a)(5) (Thomson/West 2007). "Section 727(a)(5) generally provides that a debtor must explain any loss or deficiency of assets to meet their liabilities." *Kovacs v. McVay (In re McVay),* 363 B.R. 824, 830 (Bankr.N.D.Ohio 2006). Because § 727(a)(5) "is derived from competing concerns: (1) the trustee and creditors' right to question the debtor about [debtor's] financial affairs; and (2) the knowledge that debtors will not always be

completely forthcoming with information about their financial activities," the focus is on the adequacy of the explanation, not the propriety of how the loss or diminution occurred. *Id.* at 830–31. Even "money spent on illegal activities does not run afoul of § 727(a)(5)." *Id.* at 831. "[T]he propriety of the loss, whether for illegal, immoral or otherwise imprudent activities, is not the direct concern of § 727(a)(5)[.]" *Baker v. Reed (In re Reed),* 310 B.R. 363, 368 (Bankr.N.D.Ohio 2004).

 The Court is granted broad discretion in determining whether a debtor's explanation is satisfactory. *Westerfield v. World Investment Corp.,* 2006 WL 1206386, *3–4, 2006 U.S. Dist. LEXIS 25772, *10 (E.D.Ky. May 2, 2006). "The standard for a § 727(a)(5) satisfactory explanation 'is one that is reasonable under the circumstances.' 'An important [factor is the explanation's] capacity for verification; that is, is the explanation sufficient to enable either the trustee or a creditor to properly investigate the circumstances surrounding the loss or deficiency.' " *In re McVay,* 363 B.R. at 831 (internal citations omitted).

> "Vague and indefinite explanations of losses that are based upon estimates, uncorroborated by documentation are unsatisfactory." The word satisfactory "may mean reasonable, or it may mean that the Court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation—he believes what the bankrupts say with reference to the disappearance or shortage. He is satisfied. He no longer wonders. He is contented."

*United States v. Trogdon (In re Trogdon),* 111 B.R. 655, 659 (Bankr.N.D.Ohio 1990) (internal citations omitted).

 Acceptable documentation will vary by the individual circumstances. For example—

> [W]hen living expenses are at issue an exact accounting cannot be expected, with a corresponding decrease in accuracy taking place the more time that passes. Rather, in this situation, an overall picture should be gathered as to whether the losses or deficiencies in question align with any shortfall that may be incurring in the debtor's income, and thus for which the asset in question would need to be dissipated. In conducting this analysis, the focus should center on the debtor's normal monthly income and expenses.

*In re Reed,* 310 B.R. at 371. To determine whether a debtor's explanation is satisfactory, Courts have indicated a willingness to review cancelled checks, check registers and other bank records (*In re Trogdon,* 111 B.R. at 658), the debtor's schedules (*In re McVay,* 363 B.R. at 831), or corroborative testimony (In re Reed, 310 B.R. at 372).

 The evidence Buckeye produced at trial regarding the alleged loss of assets largely concerned assets that had been disclosed by Debtor on a bank loan application in 1999, but which were not scheduled in the bankruptcy. (Pl.Ex. 7A1.) Debtor credibly testified that many of those assets had been foreclosed upon by Buckeye prior to the bankruptcy filing. (Trial Tr. at 316.) Testimony of Buckeye's witness, Mr. Barta, corroborated that Buckeye had foreclosed on many such items. (Trial Tr. at 659–64.) The *Reed* Court found a "disconnect" based upon the passage of 18 months between the sale of debtor's property and debtor's bankruptcy petition. *In re Reed,* 310 B.R. at 369. Here, Buckeye attempted to rely on documentary evidence from more than five years prior to Debtor's bankruptcy filing,

which, under the circumstances, the Court finds is too remote in time to support a cause of action under § 727(a)(5).

Buckeye's argues that Count Four is supported by Debtor's inability to explain at the § 341 meeting "how his income was less than the amount that he paid to his son." (Complaint ¶ 30.) Because of the Court's finding that there were no payments to Debtor's son, Buckeye's allegations do not support denial of discharge under Count Four.

## E. Equitable Considerations

Buckeye spent a great deal of time trying to overwhelm the Court with what it perceived to be the sheer number of "bad acts" by Debtors.[26] Buckeye—without citation to any authority and in contravention of the specific bases for denial of discharge set forth in 11 U.S.C. § 727—argues that the cumulative effect of all Debtor's conduct warrants denial of discharge on the basis of "equity." (Buckeye's Complaint, Count Five.)

■ "Section 727 of the Bankruptcy Code provides that the court must grant a discharge to a chapter 7 debtor unless one or more of the specific grounds for denial of a discharge enumerated in paragraphs (1) through (12) of section 727(a) is proven to exist." 6 COLLIERS ON BANKRUPTCY ¶ 727.01[1] (Alan N. Resnick & Henry J. Sommer eds., 15 ed. rev.2006). The Bankruptcy Code does not provide for denial of a debtor's discharge based upon general equity principles or the totality of the circumstances. To the contrary, "a debtor's discharge may only be denied or revoked for those reasons clearly expressed by statute, with all the statutory exceptions to discharge construed liberally in favor of the debtor and strictly against the party bringing the action." *Yoppolo v. Sayre (In re Sayre)*, 321 B.R. 424, 427 (Bankr. N.D.Ohio 2004) (Noting that, in bankruptcy, discharges are strongly favored because the discharge is at the heart of the law's "fresh start" policy. *Id.* at 426.).

■ "[I]t is well settled that exceptions to discharge should be limited to those clearly expressed in the Code, with exceptions not expressly included being excluded by implication." *Patterson Dental Co. v. Mendoza (In re Mendoza)*, 16 B.R. 990, 993 (Bankr.S.D.Cal.1982). See also, *Cantor, Anderson & Bordy v. Smith (In re Smith)*, 95 B.R. 468, 469 (Bankr.W.D.Ky. 1988) ("Exceptions to discharge should be limited to those clearly expressed in the Code, with exceptions not expressly included being excluded by implication.").

For the foregoing reasons, this Court finds that Buckeye has failed to state—and cannot state—a cause of action for denial of discharge based on "equity." Denial of discharge is the most serious penalty that can befall a debtor. The Bankruptcy Court may deny Debtor a discharge only for one or more of the reasons enumerated in 11 U.S.C. § 727(a); the Court is without authority to deny discharge if the elements of one of the subsections of § 727 have not been proven by the preponderance of the evidence. As a consequence, this Court

---

**26.** Some of the other instances of Debtor's conduct that Buckeye postulates warrants denial of discharge are incredibly flimsy. For example, Buckeye maintains that Debtor's failure to disclose Debtor's "check-signing authority for HHH Construction Services, Inc." warrants denial of discharge. Check-signing authority is neither an asset nor a liability that would require disclosure. Further, Plaintiffs stipulated that the partnership interest, as well as any equitable interest in HHH Construction did not need to be disclosed and are not and were not property of the Estate. (Stipulations, ¶¶ 1, 2, 3, 4, 5, 6, 7, 8, and 10.) As a consequence, failure to disclose check-signing authority for HHH Construction Services does not violate § 727 and cannot support denial of discharge.

dismisses Count Five of Buckeye's Complaint with prejudice.

## VI. CONCLUSION

For the reasons set forth above, the Court finds as follows. With respect to Trustee's Complaint: (i) Count One fails to support denial of discharge based on Debtor's alleged equitable interest in the residence; (ii) Count Two was dismissed with prejudice; and (iii) Count Three supports denial of discharge for false oath regarding the $147,000.00 Payment and $160,000.00 Mortgage. With respect to Buckeye's Complaint: (i) Count One fails to support denial of Debtor's discharge based on Debtor's alleged equitable interest in the residence; (ii) Count Two fails to support denial of Debtor's discharge; (iii) Count Three supports denial of Debtor's discharge for false oath regarding the $147,000.00 Payment and $160,000.00 Mortgage; (iv) Count Four does not support denial of Debtor's discharge; and (v) Count Five is dismissed with prejudice for failure to state a cause of action for denial of discharge.

Accordingly, Debtor will be denied a discharge in this case. An appropriate order will follow.

## ORDER DENYING DISCHARGE

For the reasons set forth in this Court's Memorandum Opinion entered on this date, the Court finds as follows. With respect to Trustee's Complaint: (i) Count One fails to support denial of discharge based on Debtor's alleged equitable interest in the residence; (ii) Count Two was dismissed with prejudice; and (iii) Count Three supports denial of discharge for false oath regarding the $147,000.00 Payment and $160,000.00 Mortgage. With respect to Buckeye's Complaint: (i) Count One fails to support denial of Debtor's discharge based on Debtor's alleged equi-

table interest in the residence; (ii) Count Two fails to support denial of Debtor's discharge; (iii) Count Three supports denial of Debtor's discharge for false oath regarding the $147,000.00 Payment and $160,000.00 Mortgage; (iv) Count Four does not support denial of Debtor's discharge; and (v) Count Five is dismissed with prejudice for failure to state a cause of action for denial of discharge.

Accordingly, Debtor is hereby denied a general discharge in this case.

**IT IS SO ORDERED.**