In re Timothy **REED**, Debtor.

Lisa Baker, Plaintiff,

v.

**Timothy Reed, Defendant.**

No. 03–3219.

United States Bankruptcy Court, N.D. Ohio.

May 14, 2004.

Gordon M Eyster, Neil A. McKown, Shelby, OH, for plaintiff.

Charles P. Derby, Norwalk, OH, for defendant.

## MEMORANDUM OPINION
## AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after a Trial on the Plaintiff's Complaint to Deny Discharge. At issue at the Trial was the applicability of three provisions of § 727(a), the section governing discharge: 11 U.S.C. §§ 727(a)(3), (4) and (5). (Doc. No. 1). At the conclusion of the Trial, the Court deferred ruling so as to afford time to review both the evidence presented in the case, as well as the applicable law. The Court has now had the opportunity to conduct this review, and for the reasons set forth herein, finds that the Plaintiff has sustained her burden with respect to her cause of action under § 727(a)(5). Accordingly, the Debtor's discharge will be Denied.

### FACTS

Although never married, the Plaintiff, Lisa Baker, and the Defendant/Debtor, Timothy Reed, were formerly involved in a relationship that produced two children. Presently, the Plaintiff is the residential parent of the Parties' minor children; the Debtor, on the other hand, is obligated to pay the Plaintiff child support.

After the conclusion of the Parties' relationship, the Plaintiff, based upon a prior, unspecified business transaction, obtained a monetary judgment in state court against the Debtor in the amount of $27,903.28. This judgment was formally entered by the state court on October 29, 2002. In the judgment entry, the state court based its award solely upon the equitable ground of unjust enrichment, finding that the Plaintiff had failed to establish any breach of contract, fraud, or intentional infliction of emotional distress on the part of the Debtor. (Plaintiff's Ex. No. 1).

On, August 20, 2001, more than one year prior to the time the above judgment was rendered, the Debtor sold a parcel of real property. After accounting for encumbrances and the cost of sale, the Debtor netted a total of $54,368.67. (Plaintiff's Ex. No. 20). Of this amount, the Debtor deposited approximately $28,000.00 in the bank, taking the remaining $26,000.00 in cash. During the ensuing months, the Debtor, from his bank account, also made disbursements in cash to himself totaling approximately $4,000.00. None (or at the most a de minimis amount) of the funds the Debtor received from the sale of his property were used to satisfy his obli-

gation to the Plaintiff. (Defendant's Ex. B).

On February 25, 2003, approximately 18 months after selling his property, the Debtor filed for relief under Chapter 7 of the United States Bankruptcy Code. At the time he filed, the Debtor listed $20.00 in liquid assets. To account for the near total dissipation of his assets, the following disbursements were shown:

$8,800.00—Two year lease of a Dodge Caravan

$5,000.00—Back Child Support

$2,500.00—Prepayment of lot rent for a mobile home

$6,000.00—repayment of loan made by mother. (Money actually paid to a third-party to buy a mobile home at which the debtor, not his mother, resides. Mobile home is titled in mother's name.)

Total $22,300.00

As for the remaining $32,068.67, the Debtor explained that during the months leading up to his bankruptcy, he was frequently unemployed, and thus the remaining funds were needed to pay for ordinary living expenses. In making this statement, the Debtor intimated, although not with any detail, that he had some "bad habits" of a rather costly nature. In addition, and while not offering any supporting documentation, the Debtor also explained that he paid some credit card bills.

At the present time, the Debtor is employed with a State Correctional Institution. At the time of the filing of his bankruptcy petition, the Debtor had held this job for a little over three months. After accounting for mandatory deductions, the Debtor's bankruptcy schedules show that he nets $1,069.00 per month.

## DISCUSSION

Determinations concerning the denial of discharge are core proceedings pursuant to 28 U.S.C. § 157. Thus, this case is a core proceeding.

The bankruptcy discharge as contained in § 524 replaces the automatic stay, and operates as an injunction against creditors collecting, as a personal liability of the debtor, any prepetition debt. *Mayton v. Sears, Roebuck & Co. (In re Mayton)*, 208 B.R. 61 (9th Cir. BAP 1997). For the debtor, this is the end goal of the bankruptcy process. Nevertheless, bankruptcy is a privilege, not a right. Debtors, therefore, under appropriate circumstances, may be denied the protections afforded by the discharge injunction of § 524. *In re Juzwiak*, 89 F.3d 424 (7th Cir.1996).

In a Chapter 7 case, a debtor's ability to receive the protections of the discharge injunction is governed by § 727(a) which begins by providing that "[t]he court shall grant the debtor a discharge, unless ..." Derived from this language is the fundamental bankruptcy principle that there exists a strong presumption in favor of providing the debtor with a discharge unless a specific exception to the contrary is applicable. *Accord Jones v. Warren Construction (In re Jones)*, 296 B.R. 447, 450 (Bankr. M.D.Tenn.2003). Section 727(a) sets forth ten grounds upon which a debtor may be denied a discharge. In very general terms, all these grounds have one thing in common: they ensure compliance with basic bankruptcy policy.

One core bankruptcy policy is honesty. *See Id.* From a global perspective, honesty envisions a debtor who "has tried his best to pay his creditors but failed." *In re Keebler*, 106 B.R. 662, 664 (Bankr.D.Hawai'i 1989). Inapposite to this concept is

the debtor who transfers his or her property for the purpose of evading payments to creditors. Although not worth discussing each in detail, numerous Bankruptcy Code sections address the negative implications of a debtor making prepetition transfers for the purpose of avoiding payment to creditors. *See, e.g.,* 11 U.S.C. §§ 547, 548, 549, 523, 727.

In order to ascertain whether a debtor has engaged in the wrongful prepetition transfer of assets, bankruptcy law requires, as part of the *quid pro quo* for receiving a bankruptcy discharge, that the debtor voluntarily disclose numerous matters relating to prepetition transactions; this is an affirmative duty, and neither the trustee nor the creditors are expected to have to pry information from the Debtor. To ensure that such information is truthful, accurate and complete, bankruptcy law provides procedures by which creditors, as well as the trustee, are entitled to question the debtor about his or her financial affairs. *See* 11 U.S.C. § 341; Bankruptcy Rules 2004 and 7026. Still, given the negative consequences that may flow from the discovery of a wrongful prepetition transfer of assets, a debtor who has engaged in any dishonest conduct naturally has a large incentive to be less than forthcoming when questioned about his or her prepetition transactions. This is where § 727(a)(5) comes into play: It takes this incentive away by conditioning a bankruptcy discharge on a debtor satisfactorily explaining any prepetition diminution or loss of an asset. *Sonders v. Mezvinsky (In re Mezvinsky),* 265 B.R. 681, 689 (Bankr. E.D.Pa.2001).

■ In support of her position that the Debtor should be denied a bankruptcy discharge, a large part of the Plaintiff's case-in-chief centered on the improper nature of those transfers made by the Debtor. For example, fraud was alleged with re-

spect to the $6,000.00 transfer made by the Debtor to his mother. The Plaintiff was also careful to call the Court's attention to the large cash transactions made by the Debtor. However, while directly relevant to the Plaintiff's other grounds to deny discharge, noticeably lacking from § 727(a)(5) is any element of wrongful intent or, for that matter, any affirmative defenses— § 727(a)(5) simply imposes strict liability. *Accord Id.*

■ Based upon the statute's lack of any culpable mental state required for the denial of a discharge, the propriety of the loss, whether for illegal, immoral or otherwise imprudent activities, is not the direct concern of § 727(a)(5); this is left to other sections of the Bankruptcy Code. Rather, when invoking § 727(a)(5), it is simply the adequacy of the explanation which is at issue. *Sonders v. Mezvinsky (In re Mezvinsky),* 265 B.R. 681, 690 (Bankr.E.D.Pa. 2001). *See also The Cadle Company v. Leffingwell (In re Leffingwell),* 279 B.R. 328 (Bankr.M.D.Fla.2002); *Goodmar v. Hamilton (In re Hamilton),* 306 B.R. 575, 586 (Bankr.W.D.Ky.2004). Accordingly, as applied to § 727(a)(5), whether the Debtor engaged in the wrongful disposition of his assets is only relevant to the extent that it pertains to a satisfactory explanation; in insolation, the alleged wrongful nature of his conduct has no bearing. *Indian Head Nat'l Bank v. Mitchell (In re Mitchell),* 74 B.R. 457 (Bankr.D.N.H.1987) (illegal activities in themselves do not operate as a bar to discharge). Also, from somewhat a different angle, the same applies with respect to the Debtor's explanation that some of his assets were depleted in order to fund his "bad habits"; the "bad habits" themselves do not matter, only the sufficiency of the explanation.

■ Despite its standard of strict liability, § 727(a)(5), as with all other provisions governing the denial of discharge,

places the burden of establishing its applicability upon the moving party. Bankruptcy Rule 4005; *Solomon v. Barman (In re Barman)*, 237 B.R. 342 (Bankr. E.D.Mich.1999). For this purpose, a preponderance of the evidence standard is applied. *Barclays/Am. Bus. Credit, Inc. v. Adams, (In re Adams)*, 31 F.3d 389 (6th Cir.1994), *cert. denied*, 513 U.S. 1111, 115 S.Ct. 903, 130 L.Ed.2d 786 (1995). In placing the burden of proof upon the moving party, however, a distinction must be drawn between the burden of persuasion and the burden of going forward, otherwise known as the burden of production. *Director, OWCP v. Greenwich Collieries*, 512 U.S. 267, 274, 114 S.Ct. 2251, 2256, 129 L.Ed.2d 221 (1994) (noting the difference).

The burden of persuasion refers to convincing the trier-of-fact as to the overall truth of the proposition; this remains firmly fixed throughout the case and is this evidentiary standard which is imposed upon the party seeking to deny a debtor a bankruptcy discharge. By comparison, the burden of going forward is a lesser standard and asks simply whether sufficient evidence has been put forth to sustain a peremptory challenge on any issue material to the disposition of the case. Unlike the burden of persuasion, however, the burden of going forward may change throughout the course of the proceeding. *Director, OWCP v. Greenwich Collieries*, 512 U.S. 267, 268, 114 S.Ct. 2251, 2253, 129 L.Ed.2d 221 (1994); *In re Ellis*, 103 B.R. 977, 980 fn. 3 (Bankr.N.D.Ill.1989). In applying § 727(a)(5) this distinction cannot be overlooked because in giving both a straightforward reading of the statute, together with the applicable case interpreting the provision, the burden of going forward is sequenced in this order.

■ First, the party moving for the denial of discharge under § 727(a)(5) has the initial burden to come forward with evidence which would tend to establish that a cause of action exists under § 727(a)(5). *Id.* In specific terms, this requires establishing that there exists the loss or the deficiency of a prepetition asset that could have been used to pay creditors. Once this burden has been established, the burden then shifts to the debtor to come forward with evidence that will satisfactorily explain the loss of the asset. *Manhattan Leasing Sys., Inc. v. Goblick (In re Goblick)*, 93 B.R. 771, 775 (Bankr.M.D.Fla. 1988). From a practicable standpoint this sequencing makes sense; it both preserves the policy affording the debtor a presumption of a discharge, while at the same time placing the burden of providing an explanation for a loss on the person best suited to know the circumstances surrounding the transfer—the debtor.

■ Two conditions must exist in order for a creditor to meet the initial burden of showing that there exists a loss or a deficiency of a prepetition asset that could have been used to pay creditors: (1) the debtor had a cognizable ownership interest in a specific fund(s) or identifiable piece of property; and (2) that such an interest existed at a time not too far removed from when the petition was filed. *Id.* As applied to this case, the first condition does not raise an issue; the Debtor on a prepetition basis received $54,368.67 in cash from the sale of his property. For purposes of the latter requirement, while the passage of 18 months between the Debtor's sale of his property and the filing of his bankruptcy petition does create a degree of disconnect, the confluence of two considerations show that this disconnect is not large enough to impair the Plaintiff's evidentiary burden.

First, § 727(a)(5) contains no explicit time limitation. Taken in its contextual setting this cannot be overlooked because a number of other provisions which ad-

dress potentially suspect transactions made by a debtor employ a one-year look back window.[1] Thus, much less offending the provision, § 727(a)(5) clearly envisions that transactions dating back 18 months or more be subject to its scrutiny.

Next, from a practical standpoint, the evidence in this case shows that when, approximately 18 months prior to filing bankruptcy, the Debtor sold his property, the funds received therefrom were not immediately dissipated, but were rather spent on a continual basis. In this case then, for purposes of applying § 727(a)(5), instead of viewing things as a snapshot, with the picture being taken when the Debtor sold his property, the circumstances should be viewed as a continuum leading up to the filing of the Debtor's bankruptcy. This point is all the more reinforced by the fact that the amount of money the Debtor received from the sale of his property was large—$54,368.67 to be exact.

Having established the loss of a prepetition asset that could have been used to pay creditors, the Debtor is now required to satisfactorily explain the loss. As applied thereto, the losses incurred by the Debtor can be broken down into two groups. The first is for those losses totaling $22,300.00 for which, as set forth in the facts, an itemization was provided—e.g., repayment of loan to mother, lease of a car. The second group is for the remaining $32,068.67 in losses, which the Debtor explained had been dissipated on account of everyday living expenses, including some costly "bad habits."

■■■ At its root, a satisfactory explanation under § 727(a)(5) is one that is reasonable under the circumstances. *Lacy Wholesale & Main Factors v. Bell (In re Bell)*, 156 B.R. 604, 605 (Bankr.E.D.Ark.

1993). At a minimum, however, and has often been said, a satisfactory explanation is one that gives more than a mere vague or indefinite statement. *See, e.g., Floret, L.L.C. v. Sendecky (In re Sendecky)*, 283 B.R. 760, 763 (8th Cir. BAP 2002). An important component in ascertaining the reasonableness of any explanation is its capacity for verification; that is, is the explanation sufficient to enable either the trustee or a creditor to properly investigate the circumstances surrounding the loss or deficiency. For example, would the information be sufficient to enable the trustee to track down a potential preferential transfer.

With this standard in mind, only the second group of transfers present an issue requiring discussion; the evidence put forth by the Plaintiff, itemized the first group of losses by transferee. Thus *sub silento*, the Plaintiff, herself, established that sufficient information exists to both verify the first group of losses and to determine their potential relationship to the Debtor's bankruptcy estate.

■■■ In addressing the second group of losses, the Debtor's explanation focused on one overall consideration: the need to provide for his everyday living expense. As for how his everyday living expenses could, over an approximately 18–month period, deplete $32,068.67 in potential estate assets, two points of causation were put forth. First, the Debtor explained to the Court that for approximately 15 out of the 18 months between the time he sold his property until the time he filed for bankruptcy he was unemployed. Second, the Debtor explained that his living expenses included some costly "bad habits."

■■■ The depletion of an asset stemming from the need to meet everyday liv-

**1.** *See* 11 U.S.C. §§ 547, 548, 727(a)(2)(A), 727(a)(7) 727(e)(2)(A).

ing expenses is a commonly used, and in appropriate circumstances will constitute a satisfactory explanation for purposes of § 727(a)(5). *See, e.g., Chevy Chase Federal Savings Bank v. Graham (In re Graham),* 122 B.R. 447, 452 (Bankr.M.D.Fla. 1990). At least, in part, this is a reflection of the reality that as a debtor slides into bankruptcy, assets may need to be utilized to make up any shortfall in expenses over income. Utilizing living expenses as an explanation for the loss of an asset, however, brings forth two competing interests. First, expenses are easy to manipulate, especially for discretionary items such as food and entertainment. At the same time, it is simply not realistic, especially the more time that passes, to expect a debtor to account for every penny spent. *See, e.g., In re Morris,* 302 B.R. 728, 743–44 (Bankr.N.D.Okla.2003).

 To reconcile these competing concerns, when living expenses are at issue an exact accounting cannot be expected, with a corresponding decrease in accuracy taking place the more time that passes. Rather, in this situation, an overall picture should be gathered as to whether the losses or deficiencies in question align with any shortfall that may be incurring in the debtor's income, and thus for which the asset in question would need to be dissipated. In conducting this analysis, the focus should center on the debtor's normal monthly income and expenses.

Looking now at this case, the bankruptcy schedules submitted by the Debtor to the Court put forth that, exclusive of child support payments which were not being regularly paid, his monthly expenses were $1,365.00; the Plaintiff did not substantively contest this figure. If one were to take this figure out over the 15–month period during which he was unemployed, a total of $20,475.00 of the $32,068.67 was needed by the Debtor to make up the shortfall in his household budget. Troubling with this figure, however, even from an initial standpoint is a couple of significant credibility gaps.

To begin with, the evidence presented in this case strongly suggested that during the time he was unemployed, the Debtor earned some income through various temporary jobs. Consequently, with some income coming in, the Debtor would not have had to deplete his accumulated assets by nearly $21,000.00 to meet his living expenses. Also casting doubt on these figures is the fact that in his bankruptcy petition, the Debtor put forth that his *current* monthly expenditures exceeded his income by over $200.00, a most likely impossibility considering that in his petition the Debtor listed only $20.00 in liquid assets. Nevertheless, even assuming for argumentative sake that the Debtor did deplete, over a 15–month period, assets totaling $20,475.00, this still leaves at least $11,593.67 of remaining accumulated assets for which there no direct accounting. By logical implication then, this amount, at a minimum, was expended on what the Debtor termed his "bad habits"

 As previously discussed, § 727(a)(5) is not concerned with the propriety of the circumstances surrounding the loss of the property. At the same time, so as not to reward bad behavior, the bar is not lowered for debtors who dispose of their assets in a less than proper manner. As set forth below, the Sixth Circuit Court of Appeals made this point very clear in the case of *Dolin v. Northern Petrochemical Co. (In re Dolin),* 799 F.2d 251 (6th Cir.1986).

 In *Dolin,* the debtor spent nearly $600,000 to fund what he contended was a drug and gambling addiction; the debtor, however, provided little or no specific information as to where the money had actu-

ally gone. In upholding the bankruptcy court's decision to deny the debtor's discharge under § 727(a)(5), the Sixth Circuit stated:

> Dolin could only allege that he had used the money to support his cocaine habit and to gamble. The actual expenditures, to whom and when made, are unknown. We recognize that Dolin would not want to keep records of his cocaine purchases and gambling because the drug purchases were illegal and the gambling may have been illegal. The mere fact that a debtor has spent money illegally does not satisfactorily explain the debtor's deficiency of assets. In particular, we hold that neither Dolin's chemical dependency nor his compulsive gambling satisfactorily explain his deficiency of assets.

*Id.* at 253. *Dolin* thus stands for the position that, even with respect to losses for which there is unlikely to be any records, unsubstantiated explanations will not suffice for purposes of § 727(a)(5); corroborating evidence, whether documentary or testimonial, must be offered. For example, and while realizing not necessarily a desirable thing, a debtor may be required to come forth with the names of witnesses who could corroborate the debtor's account of events.

In this case, however, absolutely no specificity exists. No evidence was presented "what" the Debtor's "bad habits" were, or "when" they were incurred. In addition, no evidence even exists that any funds were actually spent by the Debtor on his "bad habits." In fact, for all the Court knows, the Debtor may still retain approximately $12,000.00 in cash, not an unreasonable premise given the large amounts of cash the Debtor obtained at and after the sale of his property. Just as important, the Debtor, at least from his monthly expense figure of $1,365.00, main-

tained a rather modest lifestyle. A person, however, who lives such a modest lifestyle simply does not forget some of the details surrounding the loss of $12,000.00, which taken over 15 months, amounts to $800.00 per month or over 50% of the Debtor's monthly itemized expenses.

Thus, given the total lack of specificity, in combination with the large size of the loss at issue, the Plaintiff, given her status as a creditor, had the right to know with more specificity what happened to the funds received by the Debtor from the sale of his property. In turn, this would have allowed her to make an informed determination concerning other possible sources of relief against the Debtor for which she could have sought redress. Without this information forthcoming, however, the Debtor simply cannot show that he has satisfactorily explained the loss of a potential estate asset. While realizing that this finding leads to a very harsh penalty, it could have easily been avoided had the Debtor immediately provided to the Plaintiff a full and complete disclosure of all prepetition business transactions.

Instead, the weight of the evidence shows that the Debtor wished to remain secretive with his financial affairs, only coming forth with information when there was no alternative, and even then not in sufficient detail. Bankruptcy law does not allow this. Accordingly, the Court, after having had the opportunity to view the demeanor of the witnesses, is constrained to find that the Debtor has failed to meet his burden to "explain satisfactorily" the loss of an asset for purposes of § 727(a)(5). As such, the Debtor's discharge must be Denied.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that, pursuant to 11 U.S.C. § 727(a)(5), the bankruptcy discharge of the Defendant/Debtor, Timothy Reed, be, and is hereby, DENIED.

It is **FURTHER ORDERED** that the Clerk, United States Bankruptcy Court, serve notice of this Decision to all creditors.