In re Donald Lee DARR, Debtor.

The David F. Mungenast U/T/A Dated April 10, 1987, as Amended, Barbara J. Mungenast, Trustee, Plaintiff,

v.

Donald Lee Darr, Defendant.

Bankruptcy No. 09–50395.
Adversary No. 11–4067–705.

United States Bankruptcy Court, E.D. Missouri.

March 20, 2012.

Carl J. Geraci, Philip C. Graham, Helfrey, Neiers & Jones, P.C., St. Louis, MO, for Plaintiff.

Daniel L. Goldberg, St. Charles, MO, for Defendant.

### MEMORANDUM OPINION

CHARLES E. RENDLEN, Bankruptcy Judge.

On March 23, 2011, the Plaintiff (the "Trust") filed a three-count First Amended Complaint (the "Complaint") [Docket # 5], objecting to the granting of a discharge under § 727(a) of title 11 of the United States Code (the "Bankruptcy Code" [1]) and seeking related equitable relief.[2] On June 2, 2011, the Debtor–Defendant (the "Debtor") filed an Answer [Docket # 24]. On November 16, 2011, the matter went to trial and was taken under submission after post-trial briefing. The Court now issues this Memorandum Opinion in support of its contemporaneously entered Order of Judgment overruling the objection and granting judgment for the Debtor on all Counts.

### I. FACTUAL BACKGROUND

For approximately forty years, the Debtor owned auto dealerships in St. Louis. For much of that time, he operated through "Don Darr Chevrolet, Inc. d/b/a Don Darr Pontiac" ("DDC"), of which he was the sole shareholder. On December 15, 1998, the Debtor, in his individual capacity, entered into a lease (the "Lease") with David F. Mungenast and Barbara Mungenast, predecessors to the Trust, whereby the Debtor agreed to lease real property from the Mungenasts. DDC then operated at that leased property. Over the years, the parties allowed the Lease to continue, with adjustments to the amounts owed thereunder. As of October 2007, the base monthly rent was $41,000.00.

On April 6, 2007, DDC and Bommarito Pontiac South, Inc. ("Bommarito") entered into an asset purchase agreement (the "APA"), whereby DDC agreed to sell its assets to Bommarito (effecting the "Sale"). At the June 15, 2007 closing on the Sale, DDC received two checks from Bommarito Pontiac–Mazda South, Inc., totaling $1,214,326.09 (the "Sale Proceeds"). The Debtor executed the APA on behalf of DDC, as President and Sole Shareholder.

Attached to the APA as Exhibit 11(j) was a non-compete agreement (the "NCA") signed by Bommarito, DDC, and

---

1. Hereinafter, references to "§ [§ ]" or "section[s]" shall refer to the indicated section(s) of the Bankruptcy Code.

2. Neither the chapter 7 trustee nor the U.S. Trustee joins in the Complaint, and the chapter 7 trustee has not suggested to the Court that the Debtor was not forthcoming with the chapter 7 trustee and responsive to her requests.

the Debtor individually. Pursuant to the NCA, the Debtor agreed not to compete with Bommarito, and Bommarito agreed to pay a consulting fee (the "Consulting Income"). The redacted copy of the NCA entered into evidence reads: "Bommarito shall pay to Don Darr, or any corporation Don Darr directs, in writing, a consultant fee _____ of a month for a period of Twelve (12) months, with the first payment to be due one month after the Closing Date, for a total of Two Hundred Forty _____ over term." The evidence showed that $240,000.00 in Consulting Income was paid in monthly payments of $10,000.00 a month for 24 months, beginning the month after the closing on the Sale.

Also attached to the APA as Exhibit 4 was a phantom stock option, pursuant to which the Debtor in his personal capacity had 30 days after the Sale closing to exercise an option to purchase a non-voting 10% interest in Bommarito. In exchange for this option, the Debtor agreed not to compete with Bommarito. Within 30 days of the Sale closing, the Debtor caused to be transferred $400,094.55 of the Sale Proceeds from DDC to Bommarito, purportedly in exchange for the phantom stock. The phantom stock, however, was never issued. Instead, Bommarito carried its obligation as a note. Bommarito reported the income paid on this obligation (the "Interest Income") each year beginning in tax year 2009 on an I.R.S. Form 1099–INT ("1099–INT") issued to the Debtor in his individual capacity. As such, putting substance over form, the transfer of the $400,094.55 did not effect a stock purchase; it effected a loan to Bommarito for which the Debtor received interest payments. Moreover, because the Debtor treated $400,094.55 of the Sale Proceeds as his personal assets, and because both parties treated the Interest Income as being a debt owed to the Debtor in his individual

capacity and not to DDC, the loan arising from the $400,094.55 transfer was a loan made by the Debtor to Bommarito. In addition to directing DDC to transfer $400,094.55 of the Sale Proceeds to Bommarito, the Debtor also caused DDC to use Sale Proceeds to pay creditors, such as contractors, subcontractors, and government entities.

Through October 2007, the Debtor performed his obligations under the Lease. Thereafter, he defaulted. On February 22, 2008, the Trust filed a petition against the Debtor in state court for rent and possession (the "State Case"). On October 15, 2009 (the "Petition Date"), before a judgment was entered in the State Case, the Debtor filed his petition for bankruptcy relief.

The Debtor has a high school education and is 72 years old. As will be set forth in further detail herein, the Debtor fundamentally misunderstood the nature of the post-Sale income he received from Bommarito, as well as some of his disclosure obligations under bankruptcy law. This confusion resulted in the Debtor making numerous representations that were incorrect or inconsistent.

## II. COUNT I: OBJECTION TO DISCHARGE

### A. Overview of Law on Objecting to Discharge

 The Court grants a discharge once an individual debtor has satisfied his statutory obligations, unless circumstances warrant denial of a discharge. 11 U.S.C. § 727(a). Section 727(a) sets forth the circumstances that require denial of a discharge, most of which reflect the public policy of granting a discharge only to an honest debtor with clean hands. Because denial of a discharge is a drastic remedy, *Sullivan v. Bieniek (In re Bieniek)*, 417

B.R. 133, 136 (Bankr.D.Minn.2009) (internal citations omitted), § 727(a) "must be construed liberally in favor of the debtor and strictly against the objecting party with the burden of proof resting squarely upon the latter," *id.* at 136–37 (citing *In re Kaler v. Huynh (In re Huynh)*, 392 B.R. 802, 809–10 (Bankr.D.N.D.2008)). Pursuant to Federal Rule of Bankruptcy Procedure 7001(4), the filing of a § 727(a) objection commences an adversary proceeding. At the trial on the objection, the objecting party must establish its objection by a preponderance of the evidence. *Floret LLC. v. Sendecky (In re Sendecky)*, 283 B.R. 760, 763 (8th Cir. BAP 2002).

### B. Analysis of § 727(a) Objection

In the Complaint, the Trust alleges that denial of a discharge is proper under paragraphs (2), (3), (4)(A), (5), and (7) of § 727(a). The Court will address the objection as it relates to each § 727(a) paragraph, in turn below.

### 1. Objection as brought pursuant to § 727(a)(2).

Section 727(a)(2)(A-B) provides that the court shall grant the debtor a discharge, unless "the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed, mutilated, or concealed ... (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition." The elements "transferred, removed, destroyed, mutilated, or concealed" are disjunctive.

### a. "Concealment" ground under § 727(a)(2).

***Concealment by the failure to schedule the post-Sale income from Bommari-***

***to.*** The Trust argues that denial of a discharge under § 727(a)(2)(B) is proper because the Debtor concealed property by failing to list his post-Sale income on Schedule I of his Schedules of Assets and Liabilities (collectively, the "Schedules"; individually, each a "Schedule"). As a preliminary matter, it is undisputed that the Debtor received post-Sale income from Bommarito; it is the nature of that income that is in dispute. The testimony regarding the nature of the income was muddled, primarily because of the Debtor's failure to understand his income. The documentary evidence provides clearer guidance.

The Debtor's post-Sale, pre-Petition Date income from Bommarito took two forms. First, the Debtor received the $240,000.00 of Consulting Income. Specifically, he received $10,000.00 a month for 2 years (through July 2009). The Debtor disclosed this income at Line 1 of his Statement of Financial Affairs (the "SoFA"), where historical income for the past two calendar years is listed. At Line 1, he indicated that he received $120,000.00 in 2008, which would equal $10,000.00 a month for 12 months, and $60,000.00 in 2009, which would equal $10,000.00 a month for the 6 months running from January through July. (Presumably, the first $60,000.00 of the $240,000.00 was paid in the second half of the calendar year 2007— not a year required to be listed at Line 1.) It appears that the Consulting Income was paid to DDC and not the Debtor in his individual capacity (as was allowed under the APA, at the Debtor's direction). Although no I.R.S. Forms 1099–MISC (each, a "1099–MISC") were entered into evidence showing to whom the Consulting Income was paid in 2007, 2008, and 2009,[3]

---

**3.** The NCA provides that the income would be reported on an I.R.S. Form 1099 (presumably, a 1099–MISC). However, no 1099–

MISC issued to the Debtor for tax year 2007 or 2008 is in evidence. The only I.R.S. Form 1099 issued to the Debtor that *is* in evidence

other evidence supports the conclusion that it was paid to DDC: namely, the Debtor's federal income tax returns for 2007, 2008 and 2009 (each on an I.R.S. Form 1040 ("1040")) do not include amounts for Consulting Income, while DDC's federal income tax returns for 2008 and 2009 show that DDC earned a "consulting fee" from Bommarito of $140,-000.00[4] in 2008 and $60,000.00 in 2009. Regardless, however, the Court will treat the Consulting Income as income of the Debtor personally, given the Debtor's admission at Line 1 of his SoFA, where he represented the Consulting Income to be his personal income.

Second, the Debtor received Interest Income, beginning in 2009 (the only year in which the Debtor received both types of income: Interest Income, which was actually paid to him, and Consulting Income, which was actually paid to DDC but was imputed to him).[5] According the 1099–INT issued by Bommarito to the Debtor for 2009, the Debtor received interest-type income of $93,129.66. This income also is reflected on the Debtor's 1040 for 2009. At Line 8a of that 1040, the Debtor indicates that he received $93,152.00 in taxable interest, and his supporting Schedule B to

the 1040 indicates that $93,130.00 of the $93,152.00 was attributable to "Bommarito Pontiac South." [6]

With these understandings of the nature of Debtor's post-Sale, prepetition Bommarito income, the Court now turns to the issue of whether the Debtor concealed property through his representations regarding this income.

■ There was no concealment of the Consulting Income on Schedule I. Schedule I (captioned "Current Income of Individual Debtor(s)") requires an "estimate of average or projected monthly income at time case [is] filed" for each listed income category. Schedule I is not the form on which historical income is listed. As previously noted, historical income is listed on the SoFA. Because the Debtor stopped receiving the Consulting Income several months before the Petition Date, the Consulting Income was not part of his monthly income as of the Petition Date. Therefore, the Consulting Income was not concealed by its proper omission from the representation at Line 9 of Schedule I.

■ There also was no concealment of the Interest Income on Schedule I. Income from "Interests and dividends" is listed on

is a 1099–INT for 2009, on which is reported the Debtor's Interest Income, not his Consulting Income.

4. Why DDC was paid an additional $20,000.00 in "consulting fee" income, above the $120,000.00, is not clear. But, it also does not matter for the purposes here. It is clear that the Consulting Income was paid to DDC.

5. There is no evidence that the Debtor received Interest Income prior to 2009. The Court rejects the Trust's assertion that the Debtor received $30,000.00 in interest-type income in 2008. This assertion is based on the representation of the comptroller of Bommarito, who stated by affidavit that Bommarito "paid the amount of $30,000.00 to [the

Debtor] during 2008." However, no 1099–INT issued by Bommarito to the Debtor for a tax year prior to 2009 was introduced (the comptroller asserted that the 1099 issued to the Debtor for tax year 2008 could not be located), and the Debtor's 1040 for the prior tax years do not indicate any taxable interest at Line 8a.

6. The Debtor continues to earn Interest Income from Bommarito postpetition. The Debtor received a 1099–INT from Bommarito for 2010, showing that he had been paid $87,872.90 in interest-type income. That amount also is reflected at Line 8a and the supporting Schedule B of the Debtor's 1040 for 2010. It is projected that the Debtor earned a similar amount of Interest Income in 2011.

Line 9 of Schedule I. However, unlike Line 1, which requires the debtor to list his "Monthly gross wages, salaries, and commissions" and to "prorate if not paid monthly," Line 9 does not require prorating. Thus, if interest income is not part of a debtor's actual monthly income—even if a debtor anticipates receiving interest income in the future—he is not required to estimate, prorate, and list such anticipated interest income at Line 9. While a debtor may choose to disclose his anticipated interest income by prorating and listing it at Line 9, he also may choose to disclose the anticipated income elsewhere on Schedule I—most notably, at Line 17, where additional anticipated income is listed. *Thomson v. Glenn (In re Glenn)*, 335 B.R. 703, 708 (Bankr.W.D.Mo.2005) (holding that "it was incumbent upon [the debtor] to disclose [his significant bonus income] in some fashion—by prorating it as part of his current gross monthly income or by indicating at the bottom of Schedule I that he expected significant additional income in the following year"). Here, the Debtor chose to disclose at Line 17 that he anticipated additional income (although in his confusion about his income source, he attributed the anticipated income to the fact that he "may be called upon from titme [*sic* ] to time to do consulting work").

▪ In the alternative, even if the Debtor was required to prorate his Interest Income at Line 9, and he "concealed" property by failing to do so,[7] § 727(a)(2)(B) still is not satisfied because the Debtor did not act with the intent "to hinder, delay or defraud." The Debtor omitted the Interest Income because he did not recognize it to be interest-type income. The sworn pretrial and trial testimony make it clear that the Debtor did not grasp that his post-Sale income from Bommarito took two forms. Perhaps the confusion arose from the Debtor's lack of sophistication about contract law; perhaps it was born from the fact that the Consulting Income and the Interest Income served the same purpose (to keep the Debtor from competing with Bommarito).[8] But whatever the reason, the Debtor insisted that the income he received in 2009 and 2010 was for consulting—even when confronted with the 1099–INTs for those years. Conflating the two forms of income, he testified repeatedly that the income from the phantom stock was income for consulting services. For example, when presented with evidence that the income types were distinguishable, the Debtor—unable to appreciate the evidence and its implications—responded: "In my mind, they are not." (Trial Audio at 11:53:48.) Later, the Debtor insisted: "I call it consulting; they call it the phantom stock. That's my interpretation." (Trial Audio at 12:34:15–21.) This confusion continued throughout the trial, at times making examination of the Debtor difficult. Because of his confusion, the Debtor believed that he did not have interest-type income.[9] An omission based on this belief establishes only a mistake as to the facts—not to the intent to hinder, delay or defraud.

7. The Court makes this leap only for the sake of argument. The Court does not hold that "concealment" is shown merely by the omission of required information.

8. The Debtor's confusion may be understandable, given his level of formal education. While the Debtor may have been a gifted car salesman, that sales savvy does not impute sophistication in contract law.

9. Even if such belief were unreasonable, such unreasonableness does not impute the requisite intent. Section 727(a)(2) requires actual, not constructive, intent. *See, e.g., Najjar v. Kablaoui (In re Kablaoui)*, 196 B.R. 705, 709 (Bankr.S.D.N.Y.1996)(internal citations omitted).

This lack of intent to hinder, delay or fraud also is shown when the Debtor admits at Line 17 on Schedule I that he anticipated an increase in income. While more details at Line 17—such as an estimation of the anticipated income—and a correct identification of the anticipated income as interest-type income would have been helpful, the Debtor's representation at Line 17 still is an attempt at disclosure. When the Debtor's representations are viewed through the lens of his confusion about the nature of his income types, there is no evidence of the intent to hinder, delay or defraud.

■ *Concealment by the failure to schedule the wine collection as it existed on the Petition Date.* The Trust argues that denial of a discharge under § 727(a)(2)(B) is warranted because the Debtor concealed property by failing to list his wine collection on his original Schedule B (the form on which the debtor lists his personal property). The wine collection, as of the Petition Date, was of nominal value, as the valuable wines in the collection had been sold prepetition. When asked to explain the omission, the Debtor testified that because it was of no value, he did not schedule it. A debtor's belief that property had no value is not license to omit it from Schedule B. However, as noted before, even if the Debtor concealed property by failing to schedule it, that concealment alone does not establish a § 727(a)(2) objection. The intent to hinder, delay or defraud also must be shown. Here, the Debtor mistakenly believed that the lack of value meant that disclosure was not required. He was wrong in this belief and made a good faith error. There was no evidence to support the opposite conclusion: that the Debtor actually knew that the wine collection had to be scheduled, but (out of sheer vindictiveness or for some other similar reason) omitted the valueless collection, in an effort to hinder, delay or defraud creditors.

■ *Concealment by the failure to disclose the prepetition sale of the valuable wines sold prepetition from the wine collection.* Line 10 of the SoFA requires disclosure of property transferred within two years of the petition date. Approximately a year before the Petition Date, the Debtor sold to a third-party the valuable wines from his collection at the fair market value of $115,000.00. However, he did not list these wines at Line 10. At trial, the Debtor—who is in his seventies—testified that he forgot to schedule the wines he had sold a year before the original SoFA was filed. The Court finds this testimony to be credible to show that the Debtor lacked the intent to hinder, delay or defraud.

■ *Concealment by the failure to schedule the "Thursday Club Account."* The Trust argues that denial of a discharge under § 727(a)(2)(B) is warranted because the Debtor concealed property by failing to schedule a checking account known as the "Thursday Club Account," on which the Debtor was a signatory. Prior to the Petition Date, the account had been used to collect checks from the members of an auto dealers' weekly lunch club (the Debtor paid for the lunches at his country club and the other members reimbursed him). The Debtor testified that he did not schedule the account because he did not think of it as his property, given its purpose. While the Debtor exercised poor judgment in failing to schedule the Thursday Club Account, there was no intent to hinder, delay or defraud the creditors by this failure. As of the Petition Date, there were no funds in the account, and the Debtor's explanation, while not an excuse, demonstrates that he was not seeking to hinder, delay or defraud creditors.

*Concealment by the failure to schedule the Bommarito automobiles used by*

*the Debtor.* The APA provides to the Debtor the right to use, without charge, two vehicles provided by Bommarito. These vehicles were not given or leased to the Debtor. They belonged to Bommarito. Because the vehicles were not the Debtor's personal property, the Debtor correctly omitted them from his Schedule B, which requires a listing of personal property. The Debtor should have listed the vehicles on the SoFA at Line 14 ("Property held for another person"), where a debtor is required to "[l]ist all property owned by another person that the debtor owns or controls." However, even if the Debtor "concealed" property by failing to list the vehicles, the requisite intent to hinder, delay or defraud, again, was not shown. The Debtor failed to list two vehicles that belong to a third-party. He was not hiding property in which he had an ownership interest that could be liquidated for distribution to creditors. While he should have disclosed his holding of the vehicles, there is no evidence that, in failing to do so, he was trying to hinder, delay or defraud his creditors.

### b. "Transfer" or "remove" ground under § 727(a)(2).

From the pleadings (Pl.'s Trial Brief at 6 & Pl.'s Post–Trial Brief at 14) and evidence adduced at trial, the Trust appears to rely exclusively on the "concealed" ground to establish its § 727(a)(2) objection. However, to the degree that the Trust may object pursuant to the "transferred" or "removed" grounds,[10] the objection still would fail.

No transfer to which the Trust points supports a § 727(a)(2) objection. The transfers to the Debtor's brother and the transfer of $400,094.55 were out-of-time for purposes of § 727(a)(2). The sale of the Rolex watch and the valuable wines, each made within a year of the Petition Date, were for fair market value and do not suggest the requisite intent to hinder, delay or defraud. Even the postpetition transfer of the December 2009 check in the amount of $56,535.84 from Bommarito[11] into the Thursday Club Account does not establish a § 727(a)(2) objection. The Debtor testified that he had been advised not to deposit the check into a scheduled account (presumably because doing so might be an admission that these were estate assets and the chapter 7 trustee would administer on the funds). Following this advice, the Debtor deposited the check into the unscheduled Thursday Club Account, which had not been scheduled. The Debtor's testimony is credible to show that he thought this transfer into an unscheduled account was proper. Thus, even assuming that the $56,535.84 was an estate asset and improperly transferred to the Thursday Club Account, the Debtor still lacked the requisite intent to hinder, delay, or defraud.

It also follows that the later transfers from the Thursday Club Account likewise do not support a § 727(a)(2)(B) objection. After depositing the check into the Thursday Club Account, the Debtor used the account to pay bills. However, even if the (postpetition-received) funds in the account were property of the estate, the Debtor did not know this. There is insufficient evidence to suggest that, by using these monies, the Debtor had the intent to hinder, delay or defraud his creditors by using the monies.

---

10. It is not necessary here to distinguish between "transferred" or "removed." For brevity, the Court will use "transferred" to refer to "transferred" and "removed."

11. The Court assumes that this was an installment of the Interest Income.

## 2. Objection as brought pursuant to § 727(a)(4).

Section 727(a)(4) provides that the court shall grant the debtor a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case ... made a false oath or account." [12] The Trust argues that the Debtor made a false oath by making false representations under penalty of perjury on his Schedules and SoFA, at the § 341 meeting of creditors, and at trial.

 *False oath related to the representations of the Debtor's post-Sale Bommarito Income.* The Trust principally points to the confusing, contradictory representations made by the Debtor regarding his post-Sale income from Bommarito to establish the making of a false oath. However, even where the Debtor made representations about this income that were false, the Debtor did not "knowingly and fraudulently" make a false oath. The Debtor tried to accurately represent his income and describe his financial situation; he just often failed to do so. He was not capable of properly describing and attributing the income because he did not understand how it was structured. The result was an incompetent and sometimes-incoherent explanation of his income—but it did not amount to a knowingly and fraudulently made false oath.

*False oath related to omission of purported phantom stock on Schedules.* The Trust argues that the Debtor knowingly and fraudulently made a false oath by failing to include his (purported) phantom stock on his Schedule B. The Debtor testified that he believed that the (purported) stock was worthless. This "worthless" valuation apparently was based on the Debt-or's mistaken belief that his income was for consulting.

The belief that an interest has no value does not except it from being scheduled. Accordingly, because the Debtor believed in good faith (albeit wrongly) that he owned phantom stock, he should have listed the stock that he believed he owned on Schedule B. However, the Debtor also was functioning under the belief that because he assigned no value to the purported stock, he did not have to schedule it. By omitting it from the Schedule B, he was not seeking to make a misrepresentation—he thought he had made a complete representation as required. As such, he did not knowingly and fraudulently make a false oath by failing to schedule his purported phantom stock.

The Court notes that, when the Debtor amends his Schedules and SoFA—as he will be ordered to do in the Order of Judgment entered contemporaneously with this Memorandum Opinion—the amendments should be consistent with the findings made by the Court herein. The Debtor now knows that the transfer of the $400,094.55 actually effected a loan, not the purchase of phantom stock, and that he personally made the loan. Accordingly, it would not be proper to schedule the nonexistent phantom stock. Rather, the amendments should disclose a loan and the related annual interest paid.

 *False oath related to other omissions on Schedules and SoFA.* When the Debtor made the previously described omissions (such a the omission of the wine collection) in his Schedules and SoFA, these omissions were the result of oversight or a misunderstanding regarding his obligation to disclose. Representing what one believes in good faith to be true cannot

---

12. It is not necessary here to distinguish between "oath" and "account." For brevity, the Court will use "oath" to refer to both "oath" and "account."

be the basis of a knowingly and fraudulently made false oath, regardless of how mistaken that belief may turn out to be.

■ *False oath related to Curtis Francois.* The Trust argued that the Debtor knowingly and fraudulently made a false oath by failing to schedule Curtis Francois as a creditor. At the time the Debtor filed his Schedules, he believed that Mr. Francois did not hold a claim against the estate. The fact that Mr. Francois filed a proof of claim does not show that the Debtor made a false oath. It shows that there was a difference of opinion as to whether Mr. Francois was a creditor. Without any other evidence (such as evidence that the Debtor knew at the time the Schedules were filed that Mr. Francois held a claim), the Debtor did not knowingly and fraudulently make a false oath by omitting Curtis Francois from his list of scheduled creditors.

■ *False oath related to 2010 and 2011 Bommarito income.* The Trust suggests that the Debtor made a false oath by failing to amend his SoFAs and Schedules to reflect Interest Income paid to him in tax years 2010 and 2011. However, the Debtor was not obligated to disclose this postpetition income on the SoFAs and Schedules.

■ *False oath related to the value of DDC stock.* The Debtor did not make a false oath when he scheduled his DDC stock as valueless. As of the Petition Date, no Consulting Income or Interest Income was filtered through DDC, and DDC was not operating. There is no evidence that DDC had value.

**3. Objection as brought pursuant to § 727(a)(5).**

Section 727(a)(5) provides that the court shall grant the debtor a discharge, unless "the debtor has failed to explain satisfacto-rily … any loss of assets or deficiency of assets to meet the debtor's liabilities." Section 727(a)(5) does not require the denial of a discharge simply when there is a loss or deficiency of assets. Denial of a discharge is required only when the Debtor has failed to explain satisfactorily such loss or deficiency.

■ For § 727(a)(5) purposes, the debtor need not justify the wisdom of the disposition of the assets, *Cohen v. Olbur (In re Olbur)*, 314 B.R. 732, 741 (Bankr. N.D.Ill.2004) (internal citations omitted), or provide a "far-reaching and comprehensive" explanation, *id.* at 741 (internal citations omitted). However, the explanation "must amount to more than a 'vague, indefinite, and uncorroborated hodgepodge of financial transactions.'" *Id.* (internal citations omitted). "The explanation given by the debtor must be definite enough to convince the trial judge that assets are not missing." *Allred v. Vilhauer (In re Vilhauer)*, 458 B.R. 511, 514–15 (8th Cir. BAP 2011) (internal citation omitted). In short, "[w]hat is relevant is 'the completeness and truth' of [the debtor's] explanation. The debtor must explain in good faith 'what really happened to the assets in question.'" *Id.* (internal citations omitted). Although § 727(a)(5) has no limitations period, "courts have held that the assets in question must at least have belonged to the debtor 'at a time not remote in time to case commencement.' … How long ago is too long ago depends on the case; there is no hard and fast rule." *Cohen v. Olbur (In re Olbur)*, 314 B.R. at 741 (internal citations omitted).

■ *The dissipation of $400,094.55 of the Sale Proceeds.* In its briefing (Pl.'s Trial Brief at 13–14) and at trial, the Trust relied principally upon the dissipation of the $1,214,326.09 in Sale Proceeds to support its § 727(a)(5) objection. As discussed earlier, the Court will treat the

$400,094.55 of the Sale Proceeds transferred by DDC to Bommarito for the purchase of the purported phantom stock as property of the Debtor. Therefore, its dissipation properly may be the subject of a § 727(a)(5) objection. There is no mystery as to what happened to the $400,094.55. The Debtor caused DDC to transfer this amount to Bommarito, purportedly for the purchase of the phantom stock. To the extent this $400,094.55 is a "loss" or "deficiency" for purposes of § 727(a)(5), it was explained satisfactorily.

The Trust cannot genuinely argue that the whereabouts of the $400,094.55 is not explained satisfactorily, as the Trust itself established what happened to the money. The Trust's real complaint is that the transfer of the $400,094.55 benefited the Debtor and not the Trust, and frames this complaint in the insinuation that the Debtor violated the APA. The Trust points to Paragraph 3 of the APA, which includes a Lease buy-out provision, and the APA's Closing Statement Summary, where the parties calculated the Sale Proceeds to include $451,000.00 to be paid to DDC for the Debtor's rent obligation under the Lease as well as additional amounts for the Debtor's property tax obligations under the Lease. At trial, the Trust argued that it was entitled to an explanation as to why the $451,000.00–plus included in the Sale Proceeds calculation for the Lease buy-out was not paid to the Trust. Underlying the Trust's argument is the suggestion that because the APA included a Lease buy-out provision, the Debtor was required to use the portion of the Sale Proceeds allotted for that buy-out to, in fact, buy out the Lease. However, regardless of the APA, the Debtor remained obligated to the Trust only pursuant to the terms of the Lease. The Trust was entitled to nothing other than performance by the Debtor under the Lease.

But perhaps more importantly, even if the transfer of the $400,094.55 was improper, as the Trust suggests—or even if it was imprudent, fraudulent, or flat-out illegal—such impropriety, imprudence, fraudulence, or criminality would be irrelevant to the § 727(a)(5) analysis. The issue is whether the Debtor explained satisfactorily the loss or deficiency of the $400,094.55, not whether that explanation established that the loss or deficiency is a result of a legally sound or financially wise dissipation. *Buckeye Retirement Co., LLC. v. Hake (In re Hake)*, 387 B.R. 490, 511–12 (Bankr.N.D.Ohio 2008).

■ *The dissipation of the remainder of the Sale Proceeds.* The Trust failed to show that the remainder of the Sale Proceeds was prepetition property of the Debtor. While it is clear that the Debtor treated $400,094.55 of the Sale Proceeds as his personal property by causing DDC to use that portion to benefit the Debtor individually, the evidence is less clear that the remainder of the Sale Proceeds were similarly treated. The Court is not convinced that the remainder of the Sale Proceeds should be deemed to have been the Debtor's personal property, and thus the dissipation of the remainder of the Sale Proceeds cannot be the basis of a § 727(a)(5) objection.

However, even if all of the Sale Proceeds can be deemed to have been the Debtor's personal property, the dissipation of the remainder is explained satisfactorily. The Debtor testified that $600,000.00 amount was used to satisfy "state" obligations (presumably, taxes). The Court finds this testimony to be credible and reasonable given the circumstances. That leaves the remaining $214,231.59 of the Sale Proceeds ($1,214,326.09 less the $400,094.55 and the $600,000.00). The record shows that the Debtor had significant financial obligations in the years between

the Sale and the Petition Date, and was unable to meet those obligations. The Debtor continued to incur and juggle living expenses, litigation fees, and non-consumer debts.[13] And through October 8, 2007, the Debtor continued to make payments to the Trust on his monthly $41,000,000 obligation under the Lease. Given this cumulative picture of the Debtor's financial obligations, the Court would have no difficulty finding that, if the remainder of the Sale Proceeds was used for by the Debtor as his personal funds, they were spent defraying his considerable obligations. *See (Baker v. Reed) In re Reed*, 310 B.R. 363, 370–71 (Bankr.N.D.Ohio 2004) (reasoning that "[t]he depletion of an asset stemming from the need to meet everyday living expenses is a commonly used, and in appropriate circumstances will constitute a satisfactory[,] explanation ... it is simply not realistic, especially the more time that passes, to expect a debtor to account for every penny spent ... when living expenses are at issue an exact accounting cannot be expected, with a corresponding decrease in accuracy taking place the more time that passes ..." (internal citations omitted)). As such, even if the remainder of the Sale Proceeds was prepetition property of the Debtor, the dissipation of which constituted a "loss" or "deficiency," such loss or deficiency was explained satisfactorily.

■ *The dissipation of the $56,535.84 check.* In addition to pointing to the dissipation of the Sale Proceeds as a basis for a § 727(a)(5) objection, the Trust also pointed to the dissipation of the $56,535.84 received from Bommarito postpetition in support of denial of a discharge under § 727(a)(5). Assuming that the $56,535.84 was property of the estate, the Debtor satisfied his burden of explaining satisfactorily the loss of these funds. He testified

credibly that he used these funds to pay his postpetition bills and living expenses. Again, the Trust's real issue was with the propriety of this use. As explained, § 727(a)(5) does not offer relief for the improper use of estate assets—only for their unaccounted use.

While a more detailed accounting of the complained-of dissipations would have been even stronger evidence for the Debtor, his explanations were not insufficiently vague considering the circumstances. The Court is firmly convinced that the monies were spent on either DDC debts or the Debtor's personal obligations and the assets are not "missing." The Court also notes that the chapter 7 trustee has not made any suggestion that she, as the administrator of the estate, believes that any assets are missing or was unable to investigate the circumstances surrounding the loss or deficiency.

**4. Objection as brought pursuant to § 727(a)(3) and (7).**

The Trust cites § 727(a)(3) and § 727(a)(7) as two paragraphs providing a basis for its objection to the discharge. However, in its Trial Brief, the Trust did not argue that there is a basis under either of these paragraphs for denial of discharge. Rather, it represented that it seeks relief "primarily" under § 727(a)(2), § 727(a)(4)(A), and § 727(a)(5)—not mentioning § 727(a)(3) or § 727(a)(7). (Pl.'s Pretrial Brief at 4.) The Trust did not cite to § 727(a)(3) or § 727(a)(7) in its opening statement, did not focus any of its evidentiary presentation on those paragraphs in particular, and did not cite to these paragraphs in its Post–Trial Brief. The Court deems the Trust to have abandoned its position that these paragraphs are bases for denial of a discharge.

---

**13.** The Debtor's main bankruptcy case is a "primarily non-consumer debt" case.

In the alternative, even if the Trust did not abandon its position that these paragraphs are bases for denial of a discharge, the Court would find that the Trust failed to meet its evidentiary burden as these paragraphs. Section 727(a)(3) provides that [t]he court shall grant the debtor a discharge, unless "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information . . . from which the debtor's financial condition or business transactions might be ascertained . . ." There was no evidence that the debtor committed such an act regarding recorded information. Section 727(a)(7) provides that the Court shall grant the debtor a discharge unless "the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case . . . concerning an insider." 11 U.S.C. § 727(a)(7). An "insider" of an individual debtor includes a "relative of the debtor . . . or [a] corporation of which the debtor is . . . [a] person in control." 11 U.S.C. § 101(31)(A). The Trust established that there were two insiders of the Debtor (the Debtor's brother and DDC). However, the Trust did not establish that the Debtor committed any act specified in the applicable paragraphs concerning such insider.

## III. COUNTS II AND III (REQUESTS FOR EQUITABLE RELIEF)

In addition to the objection to the granting of the discharge as brought in Count I, the Complaint brings two other counts. In Count II, the Trust seeks the imposition of a constructive trust on a July 1, 2010 check written by Bommarito, the Thursday Club account, and "all other property received by [the Debtor and DDC] that was intended to pay [the Debtor's] personal obligations under the Lease." (Pl.'s Trial Brief at 15.) In Count III, the Trust seeks an accounting of the Debtor's property and funds. Under § 105, the Court has the authority to grant equitable relief in connection with sustaining an objection to the granting of the discharge under § 727(a). However, here, the Court will not sustain the objection. Moreover, no further accounting is needed, as the Court will order that the Debtor amend his bankruptcy filings to correctly account for his property and obligations, and the Trust is not entitled as a matter of equity to the imposition of a constructive trust.

Accordingly, contemporaneously with the entry of this Memorandum Opinion, the Court will enter an Order of Judgment denying the relief requests made in Counts II and III and granting judgment in favor of the Defendant be entered on Counts II and III.

## IV. CONCLUSION

For the reasons set forth herein, the Court will enter an Order of Judgment overruling the Trust's objection and entering judgment on all counts in favor of the Debtor. Such Order also will direct the Debtor to amend his Schedules and SoFA in all ways necessary, within 14 days of entry of the Order of Judgment. Among these amendments must be disclosure of the $400,094.55 loan made to Bommarito (which was created when the parties treated the phantom stock interest as an interest-bearing note), to allow the chapter 7 trustee to determine proper administration. Failure to timely comply and amend will result the issuance of an Order to Appear and Show Cause, directing the Debtor to appear and show cause as to why his main bankruptcy case should not be dismissed for refusal to comply with a Court order.

904

A copy of this Memorandum Opinion shall be served upon the Trust's counsel, the Debtor, the Debtor's main bankruptcy case counsel, the Debtor's Adversary Proceeding counsel, the chapter 7 trustee in the main bankruptcy case, the counsel for the chapter 7 trustee in the main bankruptcy case, and the Office of the United States Trustee.